# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NESTOR ARIEL MEDINA SANCHEZ,    )
                                 )
             Petitioner,      )
                                 )
      v.                  )         1:18CV449
                                 )
DAYSI VANESSA HERRERA SANCHEZ,   )
                                 )
             Respondent.      )

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter comes before the Court for disposition of Petitioner's Verified Petition under Hague Convention Seeking Return of Child to Petitioner (Docket Entry 2 ("Petition"))[1] and Respondent's Verified Response to Petition (Docket Entry 9 ("Response")), which asserts, as an affirmative defense to the subject child's return, the Hague Convention's "Grave Risk Exception" (id. at 2-9). (See Docket Entry 24 (referring this case to undersigned Magistrate Judge for all proceedings and entry of final judgment, pursuant to 28 U.S.C. § 636(c)).) Because the credible evidence at trial clearly and convincingly established "a grave risk that [the subject child's] return would expose [her] to . . . psychological harm," Hague Convention, art. 13(b), 1988 WL 411501, at *5, the Court denies the Petition.

---

[1] "The Hague Conference on Private International Law adopted the Hague Convention on the Civil Aspects of International Child Abduction in 1980." Chafin v. Chafin, 568 U.S. 165, 168 (2013) (citing T.I.A.S. No. 11670 (available at 1988 WL 411501) (hereinafter "Hague Convention")).

The Petition demands "the return of [Petitioner's then-]eight-year-old daughter, N.D.M.H., [because she] was, without [his] consent or acquiescence, wrongfully removed from Honduras and brought to th[e United States] by her mother, Respondent . . . ." (Docket Entry 2 at 1 (parenthetical omitted); <u>see also</u> <u>id.</u> (identifying both Petitioner and Respondent as "citizen[s] of Honduras").) The Response admits that "N.D.M.H. was born in . . . Honduras . . . to Petitioner and Respondent" (Docket Entry 9 at 2), that "N.D.M.H. was eight (8) years old at the time she was removed to the United States" (<u>id.</u>), "that N.D.M.H.'s country of habitual residence was Honduras" (<u>id.</u>), and that Respondent "removed N.D.M.H. from Honduras without the consent of Petitioner" (<u>id.</u> at 9). "However, pursuant to Article 13(b) of the Hague Convention, [the Response] claims the [Grave Risk E]xception, as it applies to [N.D.M.H.'s] return to Honduras." (<u>Id.</u>) Based on that affirmative defense, the Response asks "[t]hat the Court grant a final judgment in favor of Respondent and deny Petitioner's request for [N.D.M.H.] to be returned to Honduras." (<u>Id.</u> at 14.)

The parties agreed to a pretrial schedule (<u>see</u> Docket Entry 15), which the Court adopted (with minor clarifications) (<u>see</u> Text Order dated Nov. 30, 2018; <u>see also</u> Minute Entry dated Feb. 7, 2019 (extending certain deadlines)). At the conclusion of the pretrial period, the parties filed a Joint Stipulation of Undisputed Facts

-2-

(Docket Entry 39 ("Joint Stipulation")) and the Court ruled on Petitioner's objections (Docket Entry 32) to Respondent's final pretrial disclosures (Docket Entry 23) at a final pretrial conference (see Minute Entry dated Mar. 20, 2019).  The Court also "notif[ied] the parties that, in connection with the adjudication of Respondent's Article 13(b) defense, the Court may take judicial notice, pursuant to Federal Rule of Evidence 201(b)(2), (c)(1), and (d), of the United States Department of State's September 20, 2018 Travel Advisory for Honduras and Honduras 2018 Human Rights Report, both of which [then we]re available via the United States Department of State's official website."  (Text Order dated Mar. 21, 2019.)  A three-day bench trial followed, at which Respondent, her mother and sister, an expert witness retained by Respondent, Petitioner, and the girlfriend of one of Petitioner's brothers (who shared a home with N.D.M.H., Respondent, and Petitioner, in Orocuina, Honduras, throughout the relevant period) all testified. (See Docket Entries 41-43, 47-52.)  At the conclusion of the bench trial, the Court denied Petitioner's oral motion under Federal Rule of Civil Procedure 52(c) and took the case under advisement.  (See Minute Entry with Docket Entry 43.)

The Court now enters this Order denying the Petition pursuant to the Hague Convention's Grave Risk Exception (based on Findings of Fact and Conclusions of Law stated below as required by Federal Rule of Civil Procedure 52(a)(1)).

-3-

<u>DISCUSSION</u>

"The Hague Convention sets forth a detailed framework for addressing claims of international child abduction during domestic disputes between parties in signatory nations. After the United States ratified the [Hague] Convention, Congress implemented it through ICARA[, the International Child Abduction Remedies Act, 22 U.S.C. § 9001-9011.]" <u>Padilla v. Troxell</u>, 850 F.3d 168, 175 (4th Cir. 2017) (internal footnote and citation omitted); <u>see also</u> <u>id.</u> at 175 n.5 ("The United States ratified the [Hague] Convention in 1988 . . . ."); <u>Pleites Hernandez v. Garcia Pena</u>, 820 F.3d 782, 786 (5th Cir. 2016) ("The Hague Convention . . . signatories . . . include the United States and Honduras . . . ."). "As relevant here, the [Hague] Convention provides that [A] a child who was 'wrongfully removed' from h[er] place of habitual residence in violation of a person's custody rights must be returned to that place unless [B] certain 'narrow exceptions' apply." <u>Padilla</u>, 850 F.3d at 175 (quoting <u>Contreras Alcala v. Garcia Hernandez</u>, 826 F.3d 161, 169 (4th Cir. 2016)).

Under part A of that framework:

[P]etitioner[] was required to establish, by a preponderance of the evidence, that [N.D.M.H.] w[as] "wrongfully removed . . . within the meaning of the [Hague] Convention." Thus, [Petitioner] had to prove that: (1) [N.D.M.H.] w[as] "habitually resident" in [Honduras] at the time [Respondent] removed [N.D.M.H.] to the United States; (2) the removal was in breach of [Petitioner's] custody rights under [Honduran] law; and (3) [Petitioner] had been exercising those rights at the time of removal.

-4-

Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001) (internal citation omitted) (quoting ICARA provision now codified at 22 U.S.C. § 9003(e)(1), as well as Hague Convention, art. 3, 1988 WL 411501, at *2). Petitioner has carried that burden, as the parties' Joint Stipulation establishes that, while "Honduras was the habitual residence of [N.D.M.H.]" (Docket Entry 39 at 2), "Respondent removed [N.D.M.H.] from Honduras without Petitioner's permission or knowledge and brought [N.D.M.H.] to the United States" (id.), in contravention of Petitioner's ongoing "exercis[e of] his custody rights with [N.D.M.H.] as defined under Honduran law" (id.; see also id. (twice referencing Respondent's removal of N.D.M.H. from Honduras to United States as "wrongful removal")).

That determination moves the Court to part B of the (above-quoted) Hague Convention framework (as formulated by the United States Court of Appeals for the Fourth Circuit), pursuant to which N.D.M.H. "must be returned to [Honduras] unless certain narrow exceptions apply," Padilla, 850 F.3d at 175 (internal quotation marks omitted); see also id. ("Once a petitioner has shown a wrongful removal occurred, the burden shifts to the respondent to establish that one of the exceptions in the [Hague] Convention excuses return of the child." (internal quotation marks omitted)). Put another way, as a function of "substantiation by [Petitioner] that removal of [N.D.M.H.] from [Honduras] was wrongful, [her] return [to Honduras i]s required unless . . . [R]espondent[] . . .

-5-

establishe[s] one of four available defenses." Miller, 240 F.3d at 398 (citing ICARA provisions now codified at 22 U.S.C. § 9003(e)(2)); see also id. at 398-99 (outlining four exceptions in Articles 12, 13, and 20 of Hague Convention).  As noted in the Introduction, Respondent has asserted only one such affirmative defense, i.e., the Grave Risk Exception within Article 13 of the Hague Convention, pursuant to which "the judicial or administrative authority of the requested State is not bound to order the return of the child if the person . . . oppos[ing such] return establishes that . . . **b** there is a grave risk that [such] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention, art. 13, 1988 WL 411501, at *4-5 (emphasis added).  Importantly, Respondent, in "oppos[ing] the return of [N.D.M.H.] has the burden of establishing . . . by clear and convincing evidence that . . . the [Grave Risk E]xception[] set forth in [A]rticle 13b . . . of the [Hague] Convention applies[.]"  22 U.S.C. § 9003(e)(2) (emphasis added); see also Miller, 240 F.3d at 402 ("[T]he defense of 'grave risk' must be proven by clear and convincing evidence.").

For the reasons that follow, Respondent carried that burden at trial (albeit not on most of the grounds raised in the Response) and the Court thus declines "to order the return of [N.D.M.H.]," Hague Convention, art. 13, 1988 WL 411501, at *4.

-6-

The Response initially invoked the Grave Risk Exception based on these (verified (see Docket Entry 9 at 17)) allegations:

1) "returning [N.D.M.H.] to Honduras would place her at grave risk for serious sexual, physical, and emotional abuse in the future, both at Petitioner's hands and the hands of third-parties such as 'Dario,' wh[ose sexual abuse of N.D.M.H.] was facilitated and condoned by [] Petitioner and N.D.M.H.'s paternal grandmother" (id. at 10 (emphasis added)); see also id. at 5-7 (averring that "Petitioner hit N.D.M.H. with a telephone cord without rational reason," that "Petitioner worked for a man named 'Dario' who co-owned [] Petitioner's family store," that (on one occasion) "Petitioner's mother sent [Respondent] away to sell food, as a ruse to get [N.D.M.H.] away from [Respondent while] Petitioner took N.D.M.H. for a walk [during which Dario sexually assaulted her]," that Dario later began "more frequently" visiting the family home, and that, "[d]uring one visit, Dario showed N.D.M.H. pornographic videos in the home with Petitioner's full knowledge and consent");

2) "[g]iven that N.D.M.H. has already been subjected to physical abuse by Petitioner, as well as sexual abuse which was facilitated and condoned by Petitioner at the hands of a third-party, this risk [of physical or psychological harm to N.D.M.H.] if returned to Honduras is grave" (id. at 13 (emphasis added)); see also id. at 11-12 ("[N.D.M.H.] has already been subjected to

-7-

physical and sexual abuse, and the likelihood of that recurring is high if returned to Honduras, given the history. . . . Petitioner has failed to adequately protect N.D.M.H. from sexual abuse, and rather at minimum knowingly permitted, and more likely (and horrifically) facilitated, her to said sexual abuse . . . ."); and

3) "in addition to the abuse she personally suffered, [N.D.M.H.] has also been exposed to the domestic violence against [Respondent perpetrated by Petitioner], which should be taken into account by this Court" (id. at 11 (emphasis added); see also id. at 4-5 ("[Respondent] lived in constant fear of [Petitioner's] physical abuse . . . . Petitioner continued regularly beating [Respondent] . . . ."), 6 ("[In 2016], Petitioner beat [Respondent] so horrifically that she was bleeding.")).

In support of those averments, Respondent attached to her Response various records of her interactions with the United States Department of Homeland Security, including (in Exhibit 6) a "Record of Determination/Credible Fear Worksheet" (id. at 30) and "Credible Fear Interview Notes" (id. at 35), arising from her interview on June 15, 2017 (see id.), "under oath" (id. at 36), as well as (via Exhibit 7) her "I-589, Application for Asylum and for Withholding of Removal" (id. at 45), which she signed under penalty of perjury and completed with the aid of counsel (see id. at 53), and (via Exhibits 8 and 9) the original Spanish version and English translation of her "letter in support of [her a]sylum application"

-8-

(id. at 63), dated November 17, 2017 (see id. at 67). (See id. at 29-67; see also id. at 8 (referencing Exhibits 6-9); Docket Entry 23 at 14-52 (including same exhibits as final pretrial disclosures under Federal Rule of Civil Procedure 26(a)(3)(A)(iii)); Docket Entry 43 at 1 (documenting admission of same exhibits at trial).) Most prominently, Respondent declared in those documents that:

1) "[Petitioner] would never let [Respondent] out [of the family home]" (Docket Entry 9 at 40; see also id. ("He would only take me out when I had to go to work, otherwise I was locked up 24 hours a day."));

2) "every day" Petitioner "hit [Respondent], sen[t her] to work and threaten[ed her]" (id. at 39; see also id. (averring that, on "daily" basis, "[Petitioner] told [Respondent] he was going to kill [her] and [her] entire family if [she] left him"));

3) after Respondent "reported [Petitioner] because he didn't want [her] to report" his boss Dario for sexually abusing N.D.M.H., Petitioner "sent [Respondent] to the hospital because he beat [her] so bad" (id. at 40; see also id. ("[He] almost killed me. . . . [H]e would rather keep his job than protect his child[.]")); and

4) "[Petitioner] always harmed [N.D.M.H.] with words" (id. at 42) and he "always hit [N.D.M.H.]" (id. at 43; see also id. at 64 ("[N.D.M.H.] was afraid of [Petitioner], because he would beat her all the time for nothing.")).

-9-

If clear and convincing evidence at trial had shown that Petitioner previously had "facilitated and condoned" (id. at 10) sexual abuse of N.D.M.H. by a third-party in Honduras, the Court would have ruled the Grave Risk Exception satisfied based on that factual finding alone; however, although trial testimony did show in clear and convincing fashion that, while in Petitioner's care, N.D.M.H. suffered a sexual assault by a friend of Petitioner's family, no competent and/or credible evidence before the Court supports a conclusion (under any standard) that Petitioner (or any of his family members) "facilitated [or] condoned" (id.) that assault. Respondent also failed to prove by clear and convincing evidence that N.D.M.H. faces a grave risk of physical or emotional abuse by Petitioner, if returned to Honduras; to the contrary, the record reflects (at most) that (on a few occasions) he subjected her to corporal punishment that (at least arguably) lies within bounds permitted in the United States and that falls well short of the level necessary for denial of return under the Grave Risk Exception, particularly given the uncontested evidence that Respondent imposed equally harsh physical discipline on N.D.M.H. Respondent's trial testimony similarly did not support (and indeed contradicted) many (including the most serious) of her earlier averments regarding domestic abuse she endured (and N.D.M.H. witnessed). Ultimately, documented fabrications by Respondent about such matters (perjuriously presented to officials in the

-10-

United States for the purpose of procuring asylum and then tendered in like manner to this Court to support her position in this case) render unreliable most of her testimony in this proceeding.

Notwithstanding those considerations, credible evidence before the Court regarding past (and possible future) sexual abuse of N.D.M.H., including unrebutted expert testimony and Petitioner's own testimony (detailed below), proves the existence (clearly and convincingly) of "a grave risk that [N.D.M.H.'s] return [to Honduras] would expose [her] to . . . psychological harm," Hague Convention, art. 13(b), 1988 WL 411501, at *5.

### Domestic Violence against Respondent

In pressing the Grave Risk Exception, Respondent argued that N.D.M.H.'s "expos[ure] to [Petitioner's] domestic violence against [Respondent ]should be taken into account by this Court." (Docket Entry 9 at 11.) The United States Supreme Court has endorsed the basic legal premise of that argument. See Abbott v. Abbott, 560 U.S. 1, 22 (2010) ("If, for example, [a respondent] could demonstrate that returning to [the country of habitual residence of the child] would put [the respondent's] own safety at grave risk, the court could consider whether th[at risk] is sufficient to show that the child too would suffer 'psychological harm' or be placed 'in an intolerable situation.'" (quoting Hague Convention, art. 13(b), 1988 WL 411501, at *5, and citing Baran v. Beaty, 526 F.3d 1340, 1352-53 (11th Cir. 2008), and Walsh v. Walsh, 221 F.3d 204,

-11-

220-21 (1st Cir. 2000))). More specifically, as other courts have explained, "[d]omestic violence can satisfy the [Grave Risk Exception] when the respondent shows by clear and convincing evidence a <u>sustained pattern of physical abuse</u> and/or a propensity for <u>violent abuse</u>. . . . Spousal violence, in certain circumstances, can [thus] establish a grave risk of harm to the child." <u>Ermini v. Vittori</u>, 758 F.3d 153, 164 (2d Cir. 2014) (internal quotation marks omitted) (emphasis added); <u>see also</u> <u>Luis Ischiu v. Gomez Garcia</u>, 274 F. Supp. 3d 339, 351 (D. Md. 2017) ("Courts have found grave risk based on domestic abuse of the spouse in the presence of the children, even without abuse directed at the children themselves."). However, "limited incidents [of domestic abuse] aimed at persons other than the [subject] child, even if witnessed by the child, have not been found to constitute a grave risk." <u>Ermini</u>, 758 F.3d at 165; <u>see also</u> <u>Luis Ischiu</u>, 274 F. Supp. 3d at 351 ("Not every case involving [inter-parental] abuse . . . presents a grave risk [of harm to their children].").

To assess Respondent's allegations that Petitioner abused her (and exposed N.D.M.H. to such abuse), "[i]t is well for us to begin at the beginning," <u>Republican Party of N.C. v. Martin</u>, No. 88-1259, 865 F.2d 1259 (table), 1988 WL 138679, at *1 (4th Cir. Dec. 15, 1988) (unpublished). Based on the Joint Stipulation (including as to the birth-dates of all three), Petitioner (then age 20) and Respondent (then age 13) conceived N.D.M.H. in the summer of 2009.

-12-

(See Docket Entry 39 at 1.)[2]  Per Petitioner's own words, his action in that regard was "not legal" (Docket Entry 49 at 12) and "we could consider it to be rape" (id. at 14), because Respondent then remained a "child" (id. at 15).  Although unlawful (with good reason, see United States v. Burns, No. 07CR556, 2009 WL 3617448, at *12 (N.D. Ill. Oct. 27, 2009) (unpublished) (observing that "statutory rape" involves "large potential for harm to the young woman involved," even "where the guilty party was not abusive")), Respondent's trial testimony confirms that her sexual exploitation by Petitioner did not result from his use or threat of violence; rather, "he was saying pretty things to [her] and [she] fell in love and [she] went to live with him."  (Docket Entry 47 at 5.)

According to Respondent's sworn statements when she entered the United States (as quoted above), that living arrangement quickly morphed into seven years of imprisonment and involuntary servitude, enforced by daily beatings and death threats from Petitioner.  (See Docket Entry 9 at 39-40.)  To bolster that story of constant, violent subjugation, Respondent averred that she received no education beyond sixth grade.  (See id. at 39.)  By the time of trial (and despite unreservedly proffering her asylum-related statements as evidence in this case (see Docket Entry 23 at

---

[2] At one point, Petitioner testified that Respondent moved into his family home in April 2008, became pregnant in October 2008, and turned 14 in November 2008 (see Docket Entry 49 at 8-10); however, based on the birth-dates in the Joint Stipulation, as Respondent's counsel remarked during the trial, Petitioner's "math [wa]s a little off" (id. at 10).

-13-

14-52; Docket Entry 43 at 1)), Respondent's depiction materially changed; for example, she admitted that, "[a]fter [she] moved in with [Petitioner], [she] continued to go to school" (Docket Entry 47 at 46), ultimately "obtain[ing] a computer science degree" (id. at 47), when she "graduated . . . in December 2014" (id.). In other words, contrary to the portrait Respondent painted upon crossing into the United States, Petitioner did not forcibly end her scholastic career as a sixth-grader, as (while living with him) she "actually [acquired] six or seven more years of education than sixth grade" (id. at 49), i.e., the equivalent of "an associate's degree here in the United States" (id. at 48).

Of similar import, after Respondent testified that, "[a]t the beginning [of her cohabitation with Petitioner,] everything was fine" (id. at 7) and her counsel asked "how did that change as time progressed?" (id.), Respondent did not describe acts or threats of violence doled out by Petitioner each day to keep her in bondage; instead, she said: "Well, shortly after I moved in with him I realized that he was still with the girlfriend that he had before me." (Id.) Any such cad-like conduct – though undoubtedly distressful to Respondent (particularly given her then-tender age) – decidedly differs from the dire domestic confinement she related in seeking asylum (and in raising the Grave Risk Exception).

During the trial, Respondent also testified – in contravention of her former assertion that Petitioner "only let [her] leave the

-14-

house to work" (Docket Entry 23 at 29) – that she and another woman living in the home took their daughters "to parks . . . [and] the river" (Docket Entry 47 at 67), as well as that (besides leaving the house regularly for years to attend school) Respondent went "out [to] do [her] homework with [her] classmates" (id. at 51) and completed "a cake decorating course" (id. at 68). In another about-face at trial, Respondent replaced her allegations of "daily" threats by Petitioner that he would "kill [her] and [her] entire family if [she] left him" (Docket Entry 23 at 24), with testimony that "one time, [] before [she] left [him], . . . he threatened to kill [her]" (Docket Entry 47 at 44 (emphasis added); see also id. at 35 (placing that incident on "day before [Petitioner's] mom kicked [Respondent] out of the house" and clarifying that his mother's "insults . . . that [Respondent] was doing bad things to [Petitioner]," not any threat, "sparked [Respondent] . . . to leave" Orocuina for Roatan),[3] 71 (admitting to "mov[ing] out after [Petitioner] discovered" Respondent's involvement with United States citizen (to whose home she repaired upon arriving here and whom she married six months later (see id. at 90-91)))).[4]

_____

[3] Respondent even deceived Homeland Security officials about how she left Orocuina, telling them that she and N.D.M.H. "took a bus that took [them] to Roatan which [wa]s 12 hours by bus" (Docket Entry 23 at 51), before admitting at trial that they traveled not by "bus," but "[b]y plane" (Docket Entry 47 at 34).

[4] Additionally, Respondent offered hearsay testimony that, on the "day when [she] left for Roatan and [Petitioner] found out" (Docket Entry 47 at 44), he "said the same thing" (id.), i.e., he "threatened to kill [her]" (id.), "when he went to look for [her] with the police at [her] mom's" (id.). Respondent's mother, however, testified that Petitioner actually (and more ambiguously) said:
(continued...)

-15-

Moreover, Respondent (by her own admission at trial) fled with N.D.M.H. out of concern that Petitioner would get custody of N.D.M.H., rather than fear that he would kill anyone. (See id. at 43 ("Q. . . . Why were you afraid? A. Well, because of the threats that [Petitioner] had made of taking [N.D.M.H.] away . . . ."); accord id. at 77-78; see also id. at 31 ("I did not feel comfortable to go to court to fight for my daughter . . . ."), 92 (refusing to concede that Petitioner's "letter just asking for [Respondent] to return" N.D.M.H. to Honduras "was not a threat to kill [Respondent]," countering: "How is that not a life threat if he's taking away my -- my life, my daughter. I live for [her]."))  Nor did Respondent substantiate at trial her earlier averments that Petitioner "regularly beat[ her]" (Docket Entry 9 at 5) – or "hit" her "every day" (id. at 39) – thereby (invariably) "expos[ing N.D.M.H.] to th[at] domestic violence" (id. at 11).

Respondent did testify to two incidents (A) when, after she insisted on taking (then-newborn) N.D.M.H. to a hospital for treatment (see Docket Entry 47 at 9), Petitioner "hit [Respondent] in the face and threw [her] on the floor" (id. at 10), and (B) when, after returning to the family home from the hospital, he again "hit [her] in the face" (id. at 11).  Upon inquiry as to the

---

[4](...continued)
"'If you don't tell me where [Respondent] is, you're going to pay for that.'" (Docket Entry 50 at 26.)  According to Respondent's mother, "[she] understood that to mean he would kill [her not Respondent.]"  (Id.; see also Docket Entry 48 at 55 (setting forth Petitioner's denial "that [he] threatened [Respondent's] family with death so they would give [him] her contact information").)

"next act of violence from [Petitioner]" (id. at 12), Respondent replied merely that they "always argued" (id.).  Later in her examination, Respondent claimed that, "[w]hen [she] asked to go to [her] mother's instead of going to work" (id. at 14), Petitioner "always pushed [her], and [other] times he hit [her if she] . . . argued with him" (id.), but – when asked "how many times [] that happen[ed]" (id.) – she answered only "several times" (not regularly or daily) (id.).  Furthermore, in response to a question about "the worst extent of [her] injuries from [Petitioner]," Respondent stated "[i]t would only look red."  (Id. at 14-15.)[5]

As to the "several times" (over approximately six years) when Petitioner allegedly "pushed" or "hit" Respondent (id. at 14), leaving at "worst" (id.) a mark that "look[ed] red" (id. at 15), she managed (despite persistent probing by her counsel) to identify but two concrete instances:

1) when – at age 19 (see id. at 17) – Respondent, then "five months pregnant . . . had an argument [with Petitioner]" (id. at 16), during which "[h]e hit [her]" (id.) "in the face" (id.), "he pushed [her,] and [she] fell on the floor" (id.);[6] and

_____

[5] Consistent with the above-noted testimony regarding the (relatively limited) frequency and severity of Petitioner's assaultive conduct, Respondent's mother testified that she "personally saw [] physical marks on [Respondent] . . . several times" (Docket Entry 50 at 12; see also id. at 12-13 ("I saw her legs.  They were bruised.)), and Respondent's sister testified that she witnessed Petitioner and Respondent "scuffling or pushing around" (id. at 33).

[6] That description (though deeply disturbing) depicted a much less violent encounter than the one to which Respondent swore in her Response.  (See Docket Entry 9 at 6 ("When [Respondent] was six (6) months pregnant, Petitioner beat her (continued...)

-17-

2) when – after Respondent reported Petitioner's "abuse" to law enforcement authorities and they "told him that [she] had denounced him or tried to press charges" (id. at 32) – "[h]e hit [her] because [she] went and denounce[d] him" (id.).[7]

Otherwise, Respondent defaulted to inaccurate generalities resting on examples that did not involve Petitioner striking her:

> Q.    When is the next time you recall any physical violence at the hands of [Petitioner]?
>
> A.    Well, every time I went out because he wouldn't let me go out.
>
> Q.    And when you say you went out, where were you going?
>
> A.    Only to my mother's.
>
> Q.    And you were approximately 14, 15 at that time?
>
> A.    Well, when I lost the baby, I was already of age.  I was already 18.  No.  I'm sorry.  Nineteen.
>
> Q.    But you said that every time you went -- tried to go to your mother's . . . [Petitioner] would get physical?

_____

[6](...continued)
so horrifically that she was bleeding."); see also id. (implying that bleeding corresponded with miscarriage); but see Docket Entry 47 at 15 (stating that "worst . . . injuries" inflicted by Petitioner "only look[ed] red"), 16 (acknowledging that above-referenced "argument" occurred "a week prior" to "los[ing] . . . baby").)  Respondent also testified that the pregnancy which ended in miscarriage came about because Petitioner "forced [her] to have sex with him" (Docket Entry 47 at 15); however, when asked "how [] he force[d her]" (id.), Respondent did not refer to use or threat of force, but commented only that Petitioner "always told [her she] had to be with him" (id.).  Respondent's testimony on that front thus diverges from her mother's testimony that "one time [Petitioner] forced [Respondent to have sex] . . . and she was all scratched." (Docket Entry 50 at 11-12; see also id. at 12 ("Q.  Where were the scratches on her body? . . . A.  The neck, the arms, and the legs.").)

[7] Respondent's trial testimony did not repeat the assertion in her Response that the above-described (or some other) report she made against Petitioner actually occurred in (or progressed to) a Honduran court, where "the judge got smart with [Respondent]" (Docket Entry 9 at 42), i.e., "[t]he judge asked if [she] would have sex with [the judge] to help [her] with [her] case" (id.; accord id. at 44).  (See Docket Entry 47 at 3-104 (lacking any such account).)

-18-

A.  Yes.

Q.  And would that be before you went or after you went?

A.  Well, sometimes before, sometimes after because my brother would go and take me out, but they never respected.  Well, many -- <u>many times</u>.  And he always showed his aggressiveness.  The first thing, <u>he wanted to snatch my daughter from me</u>.

Q.  When you say "snatch," what do you mean?

A.  One of the times he did that my brother came looking for me in . . . his friend's car.  Well, <u>one time</u> I was already in the car and <u>he told my brother that if I didn't go out he was going to break the windows</u> -- the car windows.

. . . .

Q.  Do you recall how old you were when that incident happened?

A.  No.  I was not of age yet because [N.D.M.H.] was very little.

(<u>Id.</u> at 16-18 (emphasis added).)[8]

Significantly, at trial, Respondent entirely abandoned her portrayal of the most brutal attack she originally had accused Petitioner of perpetrating against her, i.e., the alleged "beating [Respondent received] because [she (A)] was going to report [the sexual assault Petitioner's] boss had done to [N.D.M.H.]" (Docket Entry 9 at 40), and then (B) actually "reported [Petitioner]

---

[8] On cross-examination, Respondent made admissions belying the notion that "[Petitioner] wouldn't let [her] go out" (Docket Entry 47 at 17) and/or that she "[o]nly [went] to [her] mother's" (<u>id.</u>).  (<u>See id.</u> at 46-49 (testifying to six or seven years of school attendance while living with Petitioner), 51 (agreeing that "sometimes [she] did go out and do [her] homework with [her] classmates"), 67 (admitting that she, a house-mate, "and the[ir] girls [went] to parks . . . [and] the river"), 68 (acknowledging completion of "cake decorating course").)

because he didn't want to report [his boss]" (id.), which "sent [Respondent] to the hospital because [Petitioner] beat [her] so bad" (id.) that he "almost killed [her]" (id.). In contrast to those startling allegations, Respondent testified at trial that:

1) Respondent never made any such report (about Petitioner's failure to report Dario) (see Docket Entry 47 at 22 ("I didn't find a way to take action because I was feeling alone with that."));

2) "since 2013," Petitioner "had his own business," which "Dario doesn't own any of" (id. at 54; see also id. at 55-56 (conceding that Dario "wasn't the store owner" and that "it was [Petitioner's store]")); and

3) during their debate about alerting authorities to Dario's abuse of N.D.M.H., Petitioner did not beat Respondent (let alone so savagely that she required hospitalization and nearly died); rather, he simply "told [her] not to say anything" (id. at 23) and then made an ambiguous statement (which she purportedly took as a threat) (see id. ("[H]e said to me, 'You know what I'm saying to you.'")), "so [she] just left it at that" (id.; see also id. ("I didn't go [make a report] because of what [Petitioner] said."))[9]

For his part, Petitioner (under questioning from his counsel) expressly denied that he struck Respondent during an argument over

_____

[9] At trial, Respondent similarly dropped her averment in the Response that "Petitioner would verbally degrade [her] by saying things like 'You are a bitch,' 'You are good for nothing,' 'You are my property,' and 'Here, we do as I say'" (Docket Entry 9 at 4 (commas added and moved)). (See Docket Entry 47 at 3-104 (offering no such testimony); see also id. at 96 (failing to identify any "insults or names [Petitioner] call[ed her]" in response to direct inquiry).)

Case 1:18-cv-00449-LPA   Document 53   Filed 03/31/21   Page 20 of 79

taking N.D.M.H. to a hospital when she fell ill as an infant (see Docket Entry 48 at 19) and/or that he "hit [Respondent] while she was pregnant with [their child lost to miscarriage]" (id. at 29; see also id. at 28-29 (refuting that said pregnancy resulted from rape)). In addition, across more than 60 transcribed pages of cross-examination, Respondent's counsel neither attempted to impeach Petitioner's foregoing denials nor ever asked him a single question about any alleged abuse of Respondent. (See Docket Entry 49 at 4-66.) Likewise, after the live-in companion of one of Petitioner's brothers gave testimony (on direct examination) that (while sharing a house with them for seven years) (A) she "never saw" Petitioner hit Respondent and (B) Respondent never claimed "he hit her" (Docket Entry 52 at 9), Respondent's counsel opted against pursuing any domestic-violence-related line-of-questioning while cross-examining that witness (see id. at 17-31).

Lastly, Respondent's expert, Bobbie Bingham, who (over the course of five sessions) evaluated N.D.M.H.'s exposure to trauma (see Docket Entry 51 at 15), testified that N.D.M.H. did not "report[] any . . . domestic violence [against Respondent]" (id. at 80); see also id. at 56 (affirming that N.D.M.H. "did not discuss" inter-parental abuse)). In fact, when Ms. Bingham posed the question, "'Did you see someone who was beaten up, shot at or killed?" (id. at 31), N.D.M.H. did not mention Petitioner beating Respondent, but "said, 'Yes, my grandfather'" (id.; see also id. at

26 ("[N.D.M.H. told [Ms. Bingham] that her grandfather had died when she was 5 years old[,] . . . her great-grandfather killed a bad guy earlier, and 'The bad guy's son came and shot [her] grandfather in the back while he was at a chicken fight.'"), 27 (stating that N.D.M.H. "indicate[d]" that "she had seen her grandfather['s body] after he died")). N.D.M.H.'s omission of any reference to Petitioner abusing Respondent bears great significance because, although "children often engage in what's called gradual disclosure" (id. at 80), "N.D.M.H., in [Ms. Bingham's] professional assessment, was very eager to tell her story" (id. at 45).

"The assessment of the [above-discussed, domestic-violence] evidence relating to [the G]rave [R]isk [Exception] depends significantly on the credibility of the witnesses." Luis Ischiu, 274 F. Supp. 3d at 351. In considering that matter, the Court cannot refrain from acknowledging "the term that's been going around: 'Believe All Women,'" Lesley Wexler, 2018 Symposium Lecture: #MeToo and Procedural Justice, 22 Rich. Pub. Int. L. Rev. 181, 187 (2019). Notably, even commentators sympathetic to such messaging have felt compelled to recast it, see id. ("'Believe All Women' . . . is a short hand for a more complex idea."), emphasizing in particular that "[i]t is not a demand to believe all women - whatever they say, regardless of what is said after that," id. at 188; see also id. ("#MeToo creator Tarana Burke has said, 'when we say we believe survivors, it's not believe them without

-22-

investigation.'"), but instead a call "[t]o approach the inquiry with an openness to their truthfulness," id., without going so far as to "assum[e] that [a woman's] side is always right," id. at 189.

Taking that tack, the Court cannot find that "[R]espondent show[ed] by clear and convincing evidence a sustained pattern of physical abuse [by Petitioner against her] and/or a propensity [on his part] for violent abuse," Ermini, 758 F.3d at 164 (internal quotation marks omitted) (emphasis added). Most significantly, as detailed above, "[t]here are many telling unexplained inconsistencies in [Respondent's trial] testimony [and] her [prior sworn statements]," Church v. Maryland, 180 F. Supp. 2d 708, 741 (D. Md.), aff'd, 53 F. App'x 673 (4th Cir. 2002). Under even the most charitable reading of the record, Petitioner significantly "change[d] h[er] story [and] . . . the very fact that [s]he made inconsistent statements would tend to undermine h[er] credibility." Latif v. Obama, 677 F.3d 1175, 1206 (D.C. Cir. 2011) (Henderson, J., concurring in the judgment) (internal ellipsis and quotation marks omitted); see also Monroe v. United States, Nos. 1:13CR252, 1:15CV1083, 2016 WL 9447757, at *6 (M.D.N.C. Oct. 28, 2016) (unpublished) (recognizing that witness's "story itself may be so internally inconsistent . . . that a reasonable factfinder would not credit it" (internal quotation marks omitted)), recommendation adopted, 2016 WL 9447054 (M.D.N.C. Dec. 5, 2016) (unpublished), appeal dismissed, 690 F. App'x 103 (4th Cir. 2017).

-23-

The Court here discredits Respondent's testimony to an even greater degree because she failed to meaningfully "attempt to explain or reconcile these glaring inconsistencies," Church, 180 F. Supp. 2d at 743, a number of which "cross the thin line between flagrant misrepresentation and blatant lie," United States v. Bolton, No. 2:16CR7, 2017 WL 2844171, at *6 (S.D. Miss. July 3, 2017) (unpublished), aff'd, 908 F.3d 75 (5th Cir. 2018), cert. denied, ___ U.S. ___, 140 S. Ct. 47 (2019). For example, when Petitioner's counsel cross-examined Respondent about her previous, manifestly false averment regarding her educational attainment, Respondent gave these evasive and unpersuasive answers:

> Q. . . . [D]o you recall crossing the border into the United States and . . . [going] through the credible fear interview . . . ?
>
> A. Yes.
>
> Q. And you were sworn to tell the truth, weren't you?
>
> A. Yes.
>
> . . . .
>
> Q. You were asked the question 'What grade did you finish in school?' And you said '6th grade.'
>
> A. Yes.
>
> Q. But you -- you got a computer science degree, didn't you?
>
> A. Yes.
>
> Q. So you didn't tell that person the truth, did you?
>
> A. When I was interviewing with that person, I was very nervous. The only thing that mattered to me more was to

-24-

tell about my daughter because my daughter is what matters to me the most.

Q. But you actually have six or seven more years of education than sixth grade.

A. Yes.

Q. Did someone tell you that you needed to appear like a poorly educated woman?

. . . .

A. I at that time felt very nervous because for the first time in my life I was in something like that and I focused specifically on my daughter.

Q. And so the question about what grade you were in or graduated from was really hard for you?

A. Yes. I -- from the little that I understood, I didn't -- I didn't -- the many questions that they asked me, what I focused on mostly was [sic] the ones about my daughter.

Q. Didn't they at the end also ask you if you understood everything?

A. Yes.

. . . .

Q. And they also asked you at the beginning if you had any questions to please stop them.

A. Yes, but I -- many times they were asking me questions and I was always answering, but I focused more when it was about my daughter.

(Docket Entry 47 at 48-50 (emphasis added).)

As that excerpt shows, when confronted with an (undeniably) untrue assertion she had woven into the narrative of horrific domestic abuse she presented (both at the border and to this Court), Respondent (A) deliberately dodged direct questions about

-25-

whether she told a falsehood and whether she did so as part of manipulative plan (see id. at 49-50), (B) unconvincingly endorsed the characterization of the task of giving her final school-year as "really hard" (id. at 50), and (C) implausibly implied (in a halting fashion indicative of prevarication) that nervousness, lack of comprehension, and preoccupation with discussing her daughter's hardships (rather than her own) caused her to forget about a half-dozen or more years of (additional) schooling (see id. at 49-50).[10]

Respondent fared no better when cross-examined about her inaccurate description(s) of Dario as Petitioner's "boss" (Docket Entry 9 at 40, 42, 65), first conceding that "Dario doesn't own any of [Petitioner's] business" (Docket Entry 47 at 54; see also id. ("They're friends.")), but then engaging in evasion tactics when pressed about a contrary representation in her asylum application (see id. at 55-56 ("Q. . . . [You stated that 'Petitioner] worked for a man named "Dario" who is the store owner, where [Petitioner] worked.' [But Dario] wasn't the store owner of where [Petitioner] worked, was he? A. Well, I always argued with [Petitioner] because he was also hanging out with bad people. Q. Can you

_____

[10] Contrary to Respondent's instant excuses for her errant educational accounting, the record reflects that (i) the asylum interviewer took great pains to relieve Respondent of any pressure to proceed or to answer if she felt anxiety or uncertainty (see, e.g., Docket Entry 9 at 36 (offering "to reschedule so that [Respondent] can have more time"), 37 (verifying that Respondent remained "comfortable having [her] interview" and advising that, "if [she] need[ed] to take a break, just [to] let [the interviewer] know"), 39 ("[P]lease listen carefully and take your time. If you don't understand a question, please ask me.")), and (ii) Respondent displayed no difficulty divulging details pertaining to herself (not just N.D.M.H.), including by interjecting information about herself in response to inquiries about N.D.M.H. (See generally id. at 38-43.)

-26-

answer my question?  [Dario] wasn't the store owner[, was he]?  A. They conducted business at [Petitioner's] business.  Q.  Please answer my question.  [Dario] wasn't the store owner[, was he]?  A. Dario?  Q.  Yes, Dario.  A. No, it was [Petitioner]." (internal parenthetical omitted) (quoting Docket Entry 9 at 65))).  Next, Respondent (ineffectively) tried to justify her prior sworn statement to the Court that "'Petitioner worked for a man named "Dario" who co-owned [] Petitioner's family store'" (id. at 56 (quoting Docket Entry 9 at 5)), as follows:  "Well, what I know is that they conduct business, they make business.  That's why I say that.  (Id.)  Ultimately, Respondent twisted herself into a reversal of her concessions that "Dario doesn't own any of [Petitioner's] business" (id. at 54) and that "[Dario] wasn't the store owner" (id. at 55).  (See id. at 57 ("Q.  But, again, did Dario co-own [] Petitioner's store?  A.  Well, from the businesses [sic] that they did, apparently, yes.").)

In sum, "the testimony of [Respondent] lacked the earmarks of credibility . . . .  The [C]ourt carefully observed the demeanor of [Respondent] as she answered the questions of counsel and it was apparent to the [C]ourt that her responses were both evasive and contrived."  United States v. Ponce-Duarte, No. 3:11CR97, 2011 WL 2791244, at *1 (W.D.N.C. July 14, 2011) (unpublished); see also The Adela, 73 U.S. 266, 267-68 (1867) ("The credibility of the[ witnesses'] statements was much impaired by their evasive

-27-

character."); Garcia v. Berkshire Life Ins. Co. of Am., 569 F.3d
1174, 1181 (10th Cir. 2009) ("[The plaintiff's] evasive,
inconsistent answers and inability to provide an explanation for
the fabrications during the hearing cast further doubt on her
accounting of events. . . . A party's willingness to fabricate
evidence bears on character and credibility . . . ."); Monroe, 2016
WL 9447757, at *6 (noting that, "in assessing the credibility of
witnesses, trial courts consider variations in demeanor and tone of
voice" (internal brackets and quotation marks omitted)).

Moreover, even if the Court accepted Respondent's trial
testimony at face value (which, for reasons just stated, the Court
cannot), that evidence established only "limited incidents [of
domestic abuse] aimed at persons other than [N.D.M.H.], [which]
even if witnessed by [N.D.M.H.], have not been found to constitute
a grave risk," Ermini, 758 F.3d at 165 (internal quotation marks
omitted). In that regard (as previously detailed), Respondent
testified that (A) Petitioner twice struck Respondent in the face
(and threw her to the ground on the first such occasion), both
shortly after N.D.M.H.'s birth (see Docket Entry 47 at 9-11), (B)
Petitioner "pushed" and/or "hit" Respondent "several times" during
the ensuing six years (id. at 14), without causing any injury
beyond a red-looking mark (see id. at 15), and (C) "one time,
[immediately] before [Respondent] left [Petitioner], . . . [he]
threatened to kill [her]" (id. at 44).

-28-

Such conduct (albeit clearly condemnable) does not match (in volume or viciousness) the violence visited on the children's mothers in decisions (approvingly cited by the Supreme Court in Abbott and subsequently issued by other courts), which have identified the inter-parental abuse there as a basis for applying the Grave Risk Exception. See, e.g., Ermini, 758 F.3d at 165 ("The [district] court also found that [the respondent] testified credibly that [the petitioner] had hit her at least 10 times . . . . The [district] court credited [her] account of having her head shoved into the kitchen cabinets while [he] attempted to suffocate and strangle her, . . . which [their children] observed." (internal quotation marks omitted)); Baran, 526 F.3d at 1342-43 (reciting how, for five years, the petitioner "bec[ame] intoxicated on an almost daily basis," and how, "[w]hen drunk, [he] was violent" and "intimidated [the respondent] physically," including "physically abusi[ng] her," by "slap[ping her] so hard she fell to the ground," "push[ing] her in the presence of his daughter, frightening and upsetting the child," "pinn[ing the then-pregnant respondent] between a door and the wall, [while] pushing on the door in a manner that applied intense pressure to her abdomen," "hurl[ing] furniture at [her]," "subject[ing her] to a six-hour, expletive-laden barrage of verbal abuse and threats while she held [their child] in her arms," and "sw[inging] a portable telephone at [her] head, causing [her] to fear for her life"); Walsh, 221 F.3d

-29-

at 209-10 (recounting eight or more episodes of the petitioner physically abused the respondent, resulting (at various times) in "[h]er face, chest, and knees all [becoming] swollen and bruised, her arms [] marked by hard gripping, and . . . a broken tooth," injury to "her coccyx," as well as "bruises and scratch marks [so severe a doctor] concluded that [her] life and health were at risk"); Luis Ischiu, 274 F. Supp. 3d at 351 (crediting the respondent's testimony about multiple "incidents of physical and sexual abuse" and "threat[s] to kill her if she fled," leading to "diagnos[is of] PTSD, depression, and anxiety").

Rather, Respondent's trial testimony about domestic violence (if believed) places this case within the range of circumstances that courts have deemed insufficient to satisfy the Grave Risk Exception. See, e.g., Souratgar v. Lee, 720 F.3d 96, 100 (2d Cir. 2013) (affirming order of return and denial of affirmative defense under Article 13(b), notwithstanding fact that "district court found spousal abuse by [the petitioner], including shouting and offensive name-calling, and several incidents of physical abuse in which he kicked, slapped, grabbed, and hit [the respondent]" (internal quotation marks omitted)); see also Luis Ischiu, 274 F. Supp. 3d at 351 ("Not every case involving [inter-parental] abuse . . . presents a grave risk [of harm to their children].") Regrettably, "[m]any cases for relief under the [Hague] Convention arise from a backdrop of domestic strife. Spousal abuse, however,

is only relevant under Article 13(b) if it seriously endangers the child." <u>Souratgar</u>, 720 F.3d at 103-04. Here, to the extent Respondent "was subjected to domestic abuse on certain occasions – albeit less than she [originally] claimed, at no time [during those occasions] was [N.D.M.H.] harmed or targeted," <u>id.</u> at 104; in fact, Respondent's trial testimony does not establish N.D.M.H.'s proximity at the five discrete times Petitioner allegedly struck or threatened to kill Respondent (<u>see</u> Docket Entry 47 at 9-12, 14-16, 32, 44),[11] and Respondent's own expert testified that N.D.M.H. reported no exposure to inter-parental abuse (<u>see</u> Docket Entry 51 at 56, 80), despite open-ended questioning about witnessing harm to others (<u>see</u> <u>id.</u> at 31). "For [the Court] to hold [Respondent's] evidence of [domestic] conflict alone, without a clear and convincing showing of [related] grave risk of harm to the child, to be sufficient to decline repatriation, would unduly broaden the Article 13(b) defense and undermine the central premise of the [Hague] Convention . . . ." <u>Souratgar</u>, 720 F.3d at 105-06; <u>see also</u> <u>id.</u> at 103 ("Th[e G]rave [R]isk [E]xception is to be interpreted narrowly, lest it swallow the rule." (internal quotation marks omitted)).

---

[11] Respondent gave a non-responsive, (over)generalized answer to the specific question of "[w]here was [N.D.M.H.] when the[ first] two instances of violence occurred" (Docket Entry 47 at 11). (<u>See</u> <u>id.</u> at 12 ("My daughter was always with me."); <u>see also</u> <u>id.</u> ("Q. And who watched [N.D.M.H.] when you had to go to school? A. The grandmother and her father.").) If (despite that ambiguity) the Court assumed (then-infant) N.D.M.H.'s presence nearby during the two assaults in question, the Court would not infer any related psychological harm to N.D.M.H., as Respondent's expert witness confirmed that, at that point, N.D.M.H. lacked "any memory capabilities" (Docket Entry 51 at 95).

No reader should misinterpret this analysis as a minimization of the plague of domestic violence. More than a quarter-century ago, Congress compiled a "legislative record [which], considered as a whole, show[ed] that violence against women is a sobering problem," Brzonkala v. Virginia Polytechnic Inst. & State Univ., 169 F.3d 820, 851 (4th Cir. 1999) (en banc) (referring to legislative history of Violence Against Women Act of 1994, Pub. L. No. 103-322, §§ 40001-40703, 108 Stat. 1796, 1902-55), and the Fourth Circuit recently reiterated that it remains so, see Harley v. Wilkinson, 988 F.3d 766, 769 (4th Cir. 2021) (quoting with approval determination in United States v. Staten, 666 F.3d 154, 167 (4th Cir. 2011), that "domestic violence is a serious problem"). In any event, the Court shares the view that "[e]ven a single incident of [such] abuse is one too many from a societal standpoint," Floyd-Evans v. Moorehead, No. 3:14CV214, 2016 WL 5374148, at *6 (S.D. Miss. Sept. 26, 2016) (unpublished). That perspective, however, does not alter the Court's obligation (A) to faithfully find the facts of this case (including as to Respondent's credibility) based on the evidence at trial, and (B) to dispassionately apply those facts to the law enshrined in ICARA and the Hague Convention (as construed by the Supreme Court and the Fourth Circuit or, in the absence of such construction on any given point, as persuasively illuminated by other courts). See generally 28 U.S.C. § 453 (setting forth judicial oath to, inter

-32-

alia, "administer justice without respect to persons, and . . . faithfully and impartially discharge and perform all duties . . . under the Constitution and the laws of the United States").

Having done so, the Court holds that Respondent failed to prove by clear and convincing evidence (or even a preponderance) that Petitioner subjected Respondent to abuse which gives rise to "a grave risk that [N.D.M.H.'s] return [to Honduras] would expose [N.D.M.H.] to physical or psychological harm," Hague Convention, art. 13(b), 1988 WL 411501, at *5.

### Physical and Emotional Abuse of N.D.M.H.

Respondent further has sought relief under the Grave Risk Exception on the ground that "N.D.M.H. was in imminent danger of . . . physical[] and emotional abuse before coming to the United States from Honduras and returning her to Honduras would place her at grave risk for serious . . . physical[] and emotional abuse in the future . . . at Petitioner's hands . . . ." (Docket Entry 9 at 10 (emphasis in original); see also id. at 13 ("Given that N.D.M.H. has already been subjected to physical abuse by Petitioner . . ., this risk [of physical and emotional abuse] if returned to Honduras is grave or severe. It is more than only a prospect of abuse.").) In support of that contention, the Response alleges the following:

1) "[o]n one occasion during a house party, Petitioner took out a gun and fired it into the air with N.D.M.H. present" (id. at 5 (emphasis added)); and

-33-

2) "[o]n <u>another occasion</u>, Petitioner hit N.D.M.H. with a telephone cord without rational reason" (<u>id.</u> (emphasis added)).

Along with those two averments as to two instances of alleged emotionally and/or physically abusive conduct by Petitioner toward N.D.M.H., the asylum-related documents appended to the Response include these related (and more sweeping) assertions:

1) Petitioner "always harmed [N.D.M.H.] with words" (<u>id.</u> at 42; <u>see also</u> <u>id.</u> at 64 ("[Petitioner] started to mistreat [N.D.M.H.]. [He] had no love for anything."));

2) Petitioner "always hit [N.D.M.H.]" (<u>id.</u> at 43; <u>see also</u> <u>id.</u> ("[He] would always hit [her] . . . when he was drunk."));

3) "[o]ne day there was a house party and . . . [Petitioner] spanked [N.D.M.H.] without reason" (<u>id.</u> at 64; <u>see also</u> <u>id.</u> (declaring that, when Respondent protested that irrational spanking of N.D.M.H., Petitioner "took out a gun and started firing into the air [while N.D.M.H.] was there," and adding that "[t]hese scenes were very often, to take out the gun and shoot in the air maybe . . . to terrify [Respondent and N.D.M.H.]")); and

4) "[N.D.M.H.] was afraid of [Petitioner], because he would beat her all the time for nothing" (<u>id.</u>; <u>see also</u> <u>id.</u> ("He hit her with what he found around him, but more often with the phone cord. There was no excuse to hit [her].")).

Just as with Respondent's original allegations about her own mistreatment (analyzed in the preceding subsection), her trial

-34-

testimony materially diverged from her above-quoted averments about Petitioner mistreating N.D.M.H. To begin, contrary to Respondent's prior assertion(s) that Petitioner "always harmed [N.D.M.H.] with words" (id. at 42) and that "[he] had no love for anything" (id. at 64), Respondent testified – in response to the question: "How would you describe the relationship between [N.D.M.H.] and [Petitioner]?" (Docket Entry 47 at 18) – that "[h]e was loving" (id.). Moreover, although (after repeating that his relationship with N.D.M.H. "was loving" (id.)) Respondent qualified that characterization, her qualification adverted only to physical discipline, not to verbal abuse or discharge of firearms (see id. ("[B]ut when he got mad, he would hit her with a phone cable.")). In fact, at no point, did Respondent testify (either generically or particularly) that Petitioner ever, never mind "very often, [would] take out [a] gun and shoot in the air [near N.D.M.H.]" (Docket Entry 9 at 64) or that he ever "harmed [N.D.M.H.] with words" (id. at 42), let alone that he did so "always" (id.). (See Docket Entry 47 at 3-104 (lacking any such testimony).)[12]

Furthermore, Respondent's trial testimony contradicted her previous claims that Petitioner "always hit [N.D.M.H.]" (Docket Entry 9 at 43 (emphasis added)), "always hit [her] . . . when he

---

[12] Under cross-examination, Respondent actually disavowed telling the asylum officer that Petitioner "'always harmed [N.D.M.H.] with words'" (Docket Entry 47 at 63-64). (See id. at 64.) Additionally, Petitioner denied at trial that "anyone in th[e family] house sho[t a] gun around the children[.]" (Docket Entry 49 at 65.)

-35-

was <u>drunk</u>" (<u>id.</u> (emphasis added)), "spanked [her] <u>without reason</u>" (<u>id.</u> at 64 (emphasis added)), and "beat her <u>all the time for nothing</u>" (<u>id.</u> (emphasis added)), relating much more restrained application of corporal punishment for misbehavior by N.D.M.H. (not constant drunken or otherwise purposeless beatings):

> Q.  How would you describe the relationship between [N.D.M.H.] and [Petitioner]?
>
> A.  He was loving.  He was loving, but when he got mad, he would hit her with a phone cable.
>
> Q.  What would he get mad about with [N.D.M.H.]?
>
> A.  <u>Sometimes she wouldn't listen to him</u>.  That's -- <u>that's when he hit her</u>.  And then <u>one time</u> I remember that <u>she was hit with the phone cable</u> was [sic] <u>when she crossed from his mother's business to his business without permission</u>.
>
> Q.  Okay.  So you said when he would get mad at her <u>he would hit her with a phone cord</u>.  <u>How many times do you recall that occurring</u>?
>
> A.  <u>Several times</u>. . . .

(Docket Entry 47 at 18 (emphasis added); <u>see also</u> <u>id.</u> at 18-19 ("[Petitioner] would only hit [N.D.M.H.] . . . from the legs down to the feet. . . .  The[ resulting marks] looked between red and purple. . . .  [They lasted t]wo or three days. . . .  [Respondent knew Petitioner struck N.D.M.H. with a cord b]ecause he would tell [Respondent, as would] his mother, and [N.D.M.H.].").)[13]

---

[13] After the above-excerpted exchange, even Respondent's counsel referred to Petitioner's use of a cord not as wanton, alcohol-fueled (or otherwise heartless) child abuse, but as a "form[] of physical discipline" (Docket Entry 47 at 19).  Nonetheless, on re-direct examination, said counsel attempted to resuscitate the statement Respondent made at the border that Petitioner "'always (continued...)

-36-

Petitioner, in turn, tendered the following testimony at trial regarding this subject:

> Q. What did you do to discipline [N.D.M.H.] when she got in trouble?
>
> A. Oh, when [she] disobeyed, I would get her attention verbally, and I would try to intimidate her so that she would not do the same things again.
>    Or she would be punished by saying, "Okay. Today you are not going to get to watch your favorite programs on TV," or taking the TV away, right.

---

[13](...continued)
hit . . . [N.D.M.H.] when he was drunk'" (id. at 95 (quoting Docket Entry 9 at 43)), by stating (in lieu of posing a proper question) that Respondent "testified today numerous times that that was [her] story, that's what [she] ha[s] told them all along" (id. at 96). The transcript of Respondent's trial testimony, however, contains no – much less "numerous" (id.) – attestations about any drunken beatings of that sort. (See id. at 3-104 (offering no such averments).) At one point on cross-examination, Respondent did inject a non-responsive comment that Petitioner "always hit [N.D.M.H.] with a cable'" (id. at 64 (emphasis added); see also id. ("I stick to what I said, that [Petitioner] hit [N.D.M.H.] or mistreated her with a cable.")); however, to the extent Respondent used the word "always" there to mean "frequently" (as opposed to "exclusively"), she did not then or thereafter square that ambiguous assertion with her earlier admission that Petitioner "hit [N.D.M.H.] with a phone cord" (id. at 18) only "several times" (id.). (See id. at 64-103 (lacking any such explanation).) Consistent with the notion that Petitioner struck N.D.M.H. with a cable as corrective punishment, Respondent's mother testified (A) that she once "saw [] marks on [N.D.M.H.'s feet]," whereupon N.D.M.H. said Petitioner "'hit [her] with a charger,'" and (B) that, when "confronted," he responded that he had to teach her "to not be stubborn." (Docket Entry 50 at 21.) Respondent's sister likewise gave testimony that, "[o]ne time," she "saw in [N.D.M.H.'s] feet that she was hit with the charger's cable." (Id. at 36; see also id. at 39 ("Q. [ Y]ou don't know how those [marks] got there[, do you]? . . . A. [N.D.M.H.] told me that [Petitioner] had hit her. I don't know what mischievous thing she did at school.").) Finally, Ms. Bingham testified that, after N.D.M.H. answered affirmatively to the trauma-assessment question, "Were you hit, punched or kicked very hard at home?" (Docket Entry 51 at 38), Ms. Bingham "asked [N.D.M.H.] to tell [Ms. Bingham] more specifically what happened . . . [and N.D.M.H.] described that [Petitioner] had beaten her with a cord" (id.; see also id. at 37 ("[N.D.M.H. stated that [Petitioner] had . . . beaten her on more than one occasion with a cord.")). "[W]hen asked to tell [Ms. Bingham] more about that cord, [N.D.M.H.] described it as like a telephone cord, and . . . sa[id] that [Petitioner] would wet the cord so that it would hurt even more and that that was his form of discipline." (Id. at 38; but see id. at 50 ("Q. Did [N.D.M.H.] describe any physical injuries to her body as a result of being beaten with the cord? A. Not that I recall."), 70 ("Q. . . . Did [N.D.M.H.] report she was afraid of [Petitioner]? . . . A. No, she did not report to me that she was afraid of [him]."), 89 (agreeing that N.D.M.H.'s mental health "diagnosis was specifically related to being the victim of an alleged sexual assault and then being held against her will by the man reportedly assaulting her").)

Q. Did you ever spank [N.D.M.H.] when she got in trouble?

A. Yes.

Q. And other than spanking her, did you hit her anywhere else on her body to discipline her?

A. No, no. I just scolded her with a slipper, as we call it.

Q. And where on her body did you scold her with a slipper?

A. In -- on her bottom.

Q. During her testimony, [Respondent] said that you hit [N.D.M.H.] with a telephone cord. Did you ever do that?

A. I did not hit her. Intimidate her, yes, but not to cause blows.

Q. What do you mean by "intimidate"?

A. That is when she was disobeying, I would say, "I'm going to hit you with this if you don't pay attention."

Q. But you never used it to hit her with it?

A. Never.

Q. [Respondent] also testified that you left marks on your daughter's body. Did you ever do that?

A. No.

Q. To your knowledge, what would happen if [N.D.M.H.] went to school with marks on her body?

A. . . . If [she] went to school with bruises or something of that kind, her school teacher would have to report to the prefector; and the prefector would have to report to the principal; and the principal would have to report to their superior, the department head; and then the person responsible for the children and both parents in the home would have to be told.

Q. And how do you know that?

-38-

A. Because the educational law sets out that if a child has serious injuries that the parents must be called in order to have a dialogue about what is going on in the home.

Q. Were you or [Respondent] ever called?

A. Never.

Q. And to your knowledge, did [Respondent] ever spank [N.D.M.H.]?

A. Also, yes.

Q. And would she use any objects?

A. Also slippers.

(Docket Entry 48 at 16-17; see also Docket Entry 49 at 25 ("Q. And you never hit her with any kind of cable? A. No.").)

The long-time girlfriend of one of Petitioner's brothers (see Docket Entry 52 at 5), who (along with her daughter) lived in the family home with Respondent and Petitioner throughout their co-habitation (see id. at 8), corroborated Petitioner's above-quoted account of his (measured) use of physical discipline:

Q. What do you do when your child disobeys you?

A. I punish her.

Q. How do you punish her?

A. I hit her with a slipper or I slap her.

Q. Where do you slap her?

A. On her legs or feet.

Q. While [N.D.M.H.] lived in Honduras, did you ever observe [Petitioner] discipline her?

A. Yes.

-39-

Q.  And what did he do to discipline her?

A.  He punished her the same way that I punish my daughter.

Q.  To your knowledge, did [Petitioner] ever hit [N.D.M.H.] with a wet phone cord?

A.  No.

(Id. at 10-11.)

Said witness also charged that Respondent imposed more severe

corporal punishment on N.D.M.H. (for highly questionable reasons):

Q.  What about [Respondent]?  What did she do to discipline [N.D.M.H.]?

A.  Sometimes she would punish her very harshly, and I told her not to do it that way because that's not how children learn.

Q.  What do you mean by "very harshly"?

A.  Well, she would hit her and just because the girl wasn't learning, and I would tell her, "No, that's not how things are done."

Q.  How would she hit her?

A.  One time she hit her with a bar.  And she came to me for help and I said, "No, I'm not the mom, but don't hit her that way."

. . . .

THE INTERPRETER:  Interpreter correction.  The word that was used may have been a stick rather than a bar.

THE COURT:  Did you say stick or bar?

THE WITNESS:  Stick.

. . . .

Q.  . . .  You said earlier that [N.D.M.H.] wouldn't learn.  What do you mean by that?

-40-

. . . .

[A.]:  The teacher had her learning her tables and her
ABCs.

. . . .

Q.  And what would happen if she didn't learn that?

A.  [Respondent] would punish [N.D.M.H.].

Q.  How would she punish her?

A.  She punished her with a stick.

(Id. at 11-12.)  Tellingly, Respondent chose not to re-take the
stand in rebuttal to dispute the testimony that she struck N.D.M.H.
with a "stick" (id. at 12), as punishment for problems "learning
her tables and her ABCs" (id.).  (See id. at 32 ("THE COURT:
. . . Are you going to have any rebuttal evidence, [counsel for
Respondent]?  [Counsel for Respondent]:  No, Your Honor.").)

To evaluate how the foregoing evidence impacts Respondent's
defense in this case, the Court first notes that "[t]he laws about
corporal punishment in the home vary widely across the globe."
Melissa L. Breger, Lucy Sorensen, Victor Asal, & Charmaine N.
Willis, Corporal Punishment, Social Norms and Norm Cascades:
Examining Cross-National Laws and Trends in Homes across the Globe,
26 Wm. & Mary J. Race, Gender & Soc. Just. 483, 493 (2020).  In the
United States, "corporal punishment, such as spanking and paddling,
is lawful in the home in all fifty states," Brad Reynolds,
Reforming and Clarifying Special Immigrant Juvenile Status, 47 J.
Legis. 101, 105 (2021), despite the fact that (for decades) the

-41-

"[e]limination or curtailment of corporal punishment would [have] be[en] welcomed by many as a societal advance," Ingraham v. Wright, 430 U.S. 651, 681 (1977). The enduring solicitude of the states for parental physical discipline rests on a federal constitutional foundation, recognized nearly a half-century ago by this Court (convened as a three-judge panel, as then-prescribed for many challenges to state authority under the United States Constitution): "[T]he fourteenth amendment concept of liberty embraces the right of a parent to determine and choose between means of discipline of children." Baker v. Owen, 395 F. Supp. 294, 299 (M.D.N.C.), aff'd, 423 U.S. 907 (1975).

More recently, North Carolina's intermediate appellate court reiterated that "[a] parent . . . has the constitutionally protected 'paramount right' to raise [the parent's] children as the parent sees fit." State v. Varner, 252 N.C. App. 226, 228, 796 S.E.2d 834, 836 (2017) (quoting Petersen v. Rogers, 337 N.C. 397, 402, 445 S.E.2d 901, 904 (1994)), discretionary review deemed improvidently granted, 371 N.C. 107, 813 S.E.2d 218 (2018). That right expressly encompasses "parental authority to administer 'moderate' corporal punishment," id. (quoting State v. Pendergrass, 19 N.C. 365, 366 (1837)), defined "to include *any* punishment which did not [(A)] produce 'permanent' injury," id. at 229, 796 S.E.2d at 836 (quoting Pendergrass, 19 N.C. at 366) (emphasis in original), (B) result from the parent's desire "to 'gratify his [or

-42-

her] own bad passions,'" id. (quoting Pendergrass, 19 N.C. at 367),
or (C) "use[] a 'cruel or grossly inappropriate' procedure or
device to discipline the minor," id. at 230, 796 S.E.2d at 837
(quoting N.C. Gen. Stat. § 7B-101(1)(c)).

As that expression of parental prerogative reflects, although
parents in the United States enjoy broad (constitutionally based)
freedom to administer physical disciplne, they "have no . . .
unlimited right to inflict corporal punishment on their children."
Sweaney v. Ada Cnty., 119 F.3d 1385, 1391 (9th Cir. 1997) (emphasis
added); see also Bowers v. Maryland, 389 A.2d 341, 348, 283 Md.
115, 126 (1978) ("[A] parent was not permitted under the common law
to resort to punishment which would exceed that properly required
for disciplinary purposes or which would extend beyond the bounds
of moderation." (internal quotation marks omitted)).  Put another
way, in this country (and consistent with the Constitution), "case
law and dependency statutes acknowledg[e] that corporal punishment
by parents is lawful unless it crosses the line to abuse." S.J.C.
v. Florida, 906 So.2d 1115, 1116 (Fla. Dist. Ct. App. 2005), review
denied, No. 05-968, 917 So.2d 195 (table), 2005 WL 3561077 (Fla.
Nov. 17, 2005) (unpublished); see also Boland v. Leska, 454 A.2d
75, 78, 308 Pa. Super. 169, 176 (1982) ("At some point . . .,
permissible corporal punishment no longer is such, but becomes
malicious abuse[.]").  "However, drawing a line between prohibited
child abuse and permissible disciplinary corporal punishment is not

-43-

an easy task." _Sada v. City of Altamonte Springs_, 434 F. App'x 845, 850 (11th Cir. 2011) (internal quotation marks omitted); _see also L.E.H. by & through D.L.H. v. Kansas Dep't of Soc. & Rehab. Servs._, No. 111,576, 2015 WL 5036725, at *7 (Kan. Ct. App. Aug. 21, 2015) (unpublished) ("Courts and agencies sometimes face a difficult task in determining when physical discipline imposed by a parent crosses the line and becomes child abuse.").[14]

Given the constitutional license afforded parents in the United States to use corporal punishment in child-rearing, as well as the difficulty judges and child-welfare officials face in differentiating authorized and unauthorized physical discipline when applying this nation's laws, the Court must exercise great caution in pronouncing particular parental practices in other countries so far out-of-bounds as to warrant denial of return under the Grave Risk Exception (which the Fourth Circuit has denominated a "narrow" defense, _Miller_, 240 F.3d at 402). _See generally Abbott_, 560 U.S. at 20 (instructing that, in resolving Hague Convention cases, "[j]udges must strive always to avoid a common tendency to prefer their own society and culture"); Breger et al., _supra_, at 494 ("In certain cultures, corporal punishment is not viewed as detrimental but rather as a tool to aid in child development."). In other words, "[w]hether this [C]ourt believes

---

[14] Indeed, academics have authored tomes on the topic. _See, e.g._, Doriane Lambelet Coleman, Kenneth A. Dodge, & Sarah Keeton Campbell, _Where and How to Draw the Line between Reasonable Corporal Punishment and Abuse_, 73 Law & Contemp. Probs. 107 (2010).

that corporal punishment is 'right' or 'wrong' is beside the point," Wise by and through Wise v. Pea Ridge Sch. Dist. #109, 675 F. Supp. 1524, 1530 (W.D. Ark. 1987), and so too the fact that, here, just as in 1975, "corporal punishment of children is today discouraged by the weight of professional opinion," Baker, 395 F. Supp. at 300; see Breger et al., supra, at 499 ("[I]n 2019, the American Academy of Pediatrics published an updated statement . . . relating to parental discipline. Th[at] policy statement condemns corporal punishment as an effective means of parental discipline." (internal parenthetical and footnote omitted)).

In lieu of personal preference or pediatricians' prescriptions about parental physical discipline – and "[a]s there is no bright line rule[ in binding precedent – the C]ourt look[s] to [non-binding] precedent and reason[s] by analogy in deciding [this matter]," BDL Int'l v. Sodetal USA, Inc., 377 F. Supp. 2d 518, 522 n.7 (D.S.C. 2005). Fortunately, "[t]his isn't the first time a court in an ICARA case has been asked to decide whether the administration of corporal punishment triggers the [ G]rave [R]isk[ E]xception. . . . [R]esearch suggests that, in most instances, courts have declined to make such a finding." Farr v. Kendrick, No. CV19-8127, 2019 WL 2568843, at *14 (D. Ariz. June 21, 2019) (unpublished), aff'd on other grounds, 824 F. App'x 480 (9th Cir. 2020); see also Altamiranda Vale v. Figuera Avila, 538 F.3d 581, 587 (7th Cir. 2008) (upholding ruling that the respondent's

-45-

"contested assertion that [the petitioner] once struck his son with a video-game cord[] fell short of meeting th[e Grave Risk Exception's] demanding burden"); <u>Castro Sarabia v. Ruiz Perez</u>, 225 F. Supp. 3d 1181, 1191-92 (D. Or. 2016) ("While I am reluctant to describe the corporal punishment . . . in this case as 'minimal,' I conclude [the respondent] has failed to demonstrate by clear and convincing evidence that these facts fit the [ G]rave [R]isk[ E]xception. . . . On a few occasions, [the child] appears to have been hit with a belt. On two other occasions, [the child] may have been hit with a branch or switch. . . . Th[ose] instances . . . cause the court some concern. But they do not rise to the level of . . . clear and convincing evidence of a 'grave risk.'"), <u>appeal dismissed</u>, slip op. (9th Cir. May 23, 2017); <u>Diaz Lopez v. Rios Alcala</u>, 547 F. Supp. 2d 1255, 1257, 1261-62 (M.D. Fla. 2008) ("[T]he [subject] children stated that the[ petitioner] had hit them with his hand and a belt. . . . This evidence only indicates that [he] has used corporal punishment to discipline the children . . . . [T]he alleged abuse . . . is not so severe that it rises to the level of an intolerable situation.").

This Court similarly declines to find the Grave Risk Exception satisfied by the conflicting evidence in this case (detailed above), which (at most) shows that "[s]everal times" (Docket Entry 47 at 18) – to discipline N.D.M.H. for darting across a street without permission and for refusing to "listen to him" (<u>id.</u>) –

-46-

Petitioner "hit her with a phone cable" (id.), "only . . . from the legs down to the feet" (id.), resulting in "red [to] purple" marks "last[ing]" for "[t]wo or three days" (id. at 19). Simply stated, such "[s]poradic or isolated incidents of physical discipline directed at the [subject] child . . . have not been found to constitute a grave risk [under Article 13(b) of the Hague Convention]." Souratgar, 720 F.3d at 104.[15]

Consistent with that determination, the Court observes that, via a decision authored by an esteemed judge now sitting on the Fourth Circuit, the North Carolina Court of Appeals has held that a "[f]ather's punishment of [his child] in the form of a spanking

_____

[15] The two cases the Court uncovered which concluded that a petitioner's corporal punishment practices provided a basis for denial of return under the Grave Risk Exception involved much more extensive and extreme conduct than the record here reveals. See Farr, 2019 WL 2568843, at *6-7 ("The petitioner] administers corporal punishment to [his three children] with great frequency. . . . [He] stat[ed] that he would physically discipline [two of] the [c]hildren two or three times in an average week and would physically discipline [the third child] between seven and fourteen times in an average week . . . . [H]e uses various objects. He previously used a section of PVC pipe or a wooden dowel and currently uses an assortment of plastic rulers . . . . [H]e usually administers between one and six strikes, depending on the sin that precipitated the session. . . . [T]here were more than five instances in which the [c]hildren sustained injuries."), *13 ("It is difficult to say what was most troubling – the frequency of the [corporal] punishment, the unusually stylized manner in which it was administered, or the risk of injury it posed."), *15 ("Some of the behavior that elicited spankings was minor disobedience, if it can be characterized as disobedience at all. Indeed, [the petitioner] admitted that he administered an average of more than one set of spankings *each day* over a period of three years, which suggests that he wasn't reserving [corporal] punishment for major transgressions . . . ." (emphasis in original)); Di Giuseppe v. Di Giuseppe, No. 07CV15240, 2008 WL 1743079, at *6 (E.D. Mich. Apr. 11, 2008) (unpublished) ("[The p]etitioner admitted while on the stand that she 'only' uses corporal punishment, and only spanking, against her children approximately two or three times a month . . . . [She] then went on to explain that she had also slapped her children with an open hand across the face hard enough to leave marks and on one occasion hard enough to result in the child hitting her head on a cupboard and drawing blood. [She] also admits she was called to school when her daughter was accused of biting [] another child, and . . . bit[] her own daughter in front of school officials as a form of discipline." (emphasis omitted)).

or <u>whipping that resulted in a bruise did not constitute abuse</u>
. . . ." <u>In re C.B.</u>, 180 N.C. App. 221, 224, 636 S.E.2d 336, 338
(2006) (Wynn, J.) (emphasis added) (internal quotation marks
omitted), <u>aff'd</u>, 361 N.C. 345, 643 S.E.2d 587 (2007). If parents
in North Carolina may punish their children by administering
"whipping[s] that result[] in [] bruis[ing]," <u>id.</u>, then a federal
court in North Carolina surely should not treat a small number of
similar disciplinary actions by Petitioner towards N.D.M.H. (in
Honduras) as clearly and convincingly creating "a grave risk . . .
[of] physical or psychological harm," Hague Convention, art. 13(b),
1988 WL 411501, at *5, warranting denial of her repatriation, <u>see
generally</u> <u>Farr</u>, 2019 WL 2568843, at *14 ("In making this assessment
[of whether a petitioner's use of corporal punishment meets the
Grave Risk Exception], it is helpful to examine some of the factors
states typically consider when determining whether a parent's use
of corporal punishment . . . constitutes child abuse."), especially
in light of the undisputed testimony that Respondent (who retains
custody of N.D.M.H. in North Carolina) previously "punish[ed] her
very harshly" (Docket Entry 52 at 11), by beating her "with a
stick" (<u>id.</u> at 12), when she struggled with school-work (<u>see</u> <u>id.</u>).[16]

---

[16] To rule otherwise (illogically) (A) would deny Petitioner access to
N.D.M.H. based on corporal punishment imposed in Honduras, which likely would not
have resulted in an abuse finding (and thus denial of his access to N.D.M.H.) if
imposed in North Carolina, while (even more illogically) (B) leaving N.D.M.H. in
the exclusive custody of Respondent in North Carolina, despite the fact that she
had used similar physical discipline to punish N.D.M.H. (with less apparent
justification). Of further note as to the first of those points, although Ms.
Bingham testified that, "[i]f these types of allegations were made and occurred
(continued...)

-48-

For all of these reasons, Respondent has not proven by a preponderance of the evidence, much less clearly and convincingly, that Petitioner physically or emotionally abused N.D.M.H. in a manner that would establish "a grave risk that [her] return [to Honduras] would expose [her] to physical or psychological harm," Hague Convention, art. 13(b), 1988 WL 411501, at *5.

### Sexual Abuse of N.D.M.H.

The dispositions in the preceding two subsections leave the issue(s) of whether "returning [N.D.M.H.] to Honduras would place her at grave risk for serious sexual . . . abuse in the future . . . [at] the hands of third-parties such as Dario, which was [allegedly] facilitated and condoned by [] Petitioner and N.D.M.H.'s paternal grandmother" (Docket Entry 9 at 10 (internal quotation marks omitted)), as well as whether, "[g]iven that N.D.M.H. has already been subjected to . . . sexual abuse which was [allegedly] facilitated and condoned by Petitioner . . ., th[e] risk [of physical or psychological harm to N.D.M.H.] if returned to Honduras is grave" (id. at 13; see also id. at 11-12 ("Petitioner has failed to adequately protect N.D.M.H. from sexual abuse, and

---

[16](...continued)
here in the United States" (Docket Entry 51 at 49), she "certainly would have to report to the authorities . . . the alleged inappropriate discipline" (id.), i.e., "[t]he beating with the cord" (id.), after which she believed "the Department of Social Services would come in and assess the situation" (id. at 50), Ms. Bingham did not testify that such physical discipline actually would result in the commencement of a child-protection proceeding, let alone an abuse adjudication or the removal of N.D.M.H. from Petitioner's custody (see id. ("They may or may not remove the child or file a petition based on what their findings are during that investigation." (emphasis added))).

-49-

rather at minimum knowingly permitted, and more likely (and horrifically) facilitated, her to said sexual abuse . . . ."), 13 ("[A] presumption that [N.D.M.H.] will suffer . . . sexual abuse if returned to Petitioner in Honduras should exist considering how and why she suffered in the past and that it is the exact same situation and caregivers to which she would be returned."). Regarding N.D.M.H.'s prior sexual abuse by Dario (and the aftermath), the Response makes the following (shocking) assertions:

1) "Petitioner worked for a man named 'Dario' who co-owned [] Petitioner's family store" (id. at 5);

2) "[i]n 2015, Petitioner's mother sent [Respondent] away to sell food, as a ruse to get [N.D.M.H.] away from [Respondent] and Petitioner took N.D.M.H. for a walk" (id.);

3) in the course of that walk, Dario sexually abused N.D.M.H. (see id. at 5-6);

4) "[Petitioner] threatened to kill [Respondent] if she reported the abuse to the police, as he did not want problems with Dario or for him to have a 'bad reputation'" (id. at 6);

5) although Petitioner's father subsequently kept Dario away, "[a]fter the death of Petitioner's father on March 19, 2016" (id.), "Dario began to visit the residence more frequently, and Petitioner's mother would continue to interfere with [Respondent's] ability to protect [N.D.M.H.], by sending [Respondent] out of the home" (id. at 7 (internal quotation marks omitted));

-50-

6) "[d]uring one [such] visit, Dario showed N.D.M.H. pornographic videos in the home with Petitioner's full knowledge and consent" (id.); and

7) "[d]ue to . . . the desperate need to protect [N.D.M.H.] from sexual . . . abuse, [Respondent and N.D.M.H.] fled to the United States" (id. at 7-8).

The asylum-related documents Respondent submitted along with the Response include these (equally or more shocking) allegations:

1) "[Petitioner's] boss wanted to abuse [N.D.M.H. in 2015]" (id. at 40; see also id. at 65 ("[Petitioner] worked for a man named 'Dario' who is the store owner, where [Petitioner] worked."));

2) "[after Petitioner's] mother sent [Respondent] to sell food" (id. at 65), "[Petitioner] and his father took [N.D.M.H.] out for a walk [during which Dario sexually abused N.D.M.H.]" (id.; see also id. ("[N.D.M.H.] was 5 years old."));

3) when "they returned" (id.), "[N.D.M.H.] ran terrified and crying to [Respondent to] tell [her what Dario] had [done]" (id.);

4) "[Petitioner] did not deny it, he just told [Respondent] not to dare report Dario to police, because [Petitioner] did not want problems" (id.; see also id. at 40 (swearing that "[Petitioner] never talks about what his boss did to [N.D.M.H.] because [Petitioner] would rather keep his job than protect [N.D.M.H.]"), 65 ("[Petitioner] and his mother would not let

-51-

[Respondent] go to the police and they threatened to kill [her], because they did not want [Dario] to have a 'bad reputation.'"));

5) "[Petitioner's] father went to look for [Dario] and beat him, [as Petitioner's father] was the only one that could do something to [Dario]" (id. at 65);

6) "[Petitioner] gave [Respondent] a beating because [she] was going to report what his boss had done" (id. at 40);

7) after Respondent "reported [Petitioner] because he didn't want [her] to report [Dario]" (id.), "[Petitioner] beat [Respondent] and sent [her] to the hospital because he beat [her] so bad" (id.; see also id. ("The police told [Petitioner] that [Respondent] reported him and [he] almost killed [her]."));

8) after "[Petitioner's] father was killed" (id. at 65), "[t]hings changed a lot without him at home" (id.), including "Dario visit[ing] the house more frequently" (id.);

9) once, "while [Petitioner's] mother sent [Respondent] to work selling food, . . . Dario showed [N.D.M.H.] pornographic videos and [Petitioner] allowed it" (id.);

10) "[Respondent] made the decision to escape [to Roatan]" (id. at 66), but Petitioner obtained "an order from [a] judge to give [N.D.M.H.'s] custody to [Petitioner]" (id.), so Respondent "decided to go to the United States with [N.D.M.H.]" (id.); and

11) "if [N.D.M.H.] returned to Honduras" (id. at 43), "[s]he will always be in fear because the man who tried to rape her is always hanging out with [Petitioner]" (id.).

Had the evidence at trial borne out those averments (particularly as to the role of Petitioner and his mother in aiding and authorizing Petitioner's employer first to molest N.D.M.H. and then to groom her with pornography, not to mention Petitioner's near-murder of Respondent for alerting law enforcement officials about his refusal to report Dario's sexual abuse of N.D.M.H.), the Court easily could conclude that the Grave Risk Exception applied; however, Respondent's trial testimony revealed much of her foregoing narrative as fallacious fiction. For starters (as discussed previously), Respondent admitted under oath that:

1) Petitioner did not work for Dario, as "since 2013 . . . [Petitioner] had his own business," which "Dario doesn't own any of" (Docket Entry 47 at 54; see also id. at 55-56 (conceding Dario "wasn't the store owner" and "it was [Petitioner's store]"));

2) Respondent did not report Petitioner to anyone in Honduras for his failure to notify authorities about Dario's sexual abuse of N.D.M.H. (see id. at 22 (acknowledging that "[she] didn't find a way to take action")); and

3) Petitioner did not beat Respondent (and certainly not within an inch of her life) due to her desire to advise anyone that Dario had sexually abused N.D.M.H. (or for any other related

-53-

reason), but rather merely "told [her] not to say anything" (id. at 23), before adding "'You know what I'm saying to you'" (id.), at which point, she "just left it at that" (id.).[17]

Respondent's trial testimony also failed to substantiate the bulk of her other (above-quoted) statements on this front. For example (and most noteworthy), although the Response declares that Petitioner and his mother "facilitated and condoned" Dario's sexual abuse of N.D.M.H. (Docket Entry 9 at 10), with "Petitioner's mother sen[ding Respondent] away to sell food, <u>as a ruse</u> to get [N.D.M.H.] away from [Respondent]" (<u>id.</u> at 5 (emphasis added)), to allow Petitioner "<u>at minimum</u> [to] <u>knowingly permit</u>[], and <u>more likely</u> (and horrifically) [to] <u>facilitate</u>[], [N.D.M.H.'s] sexual abuse [by Dario]" (<u>id.</u> at 11-12 (emphasis added)), Respondent's (following) account at trial shows no such complicity by Petitioner or his mother in the sexual abuse Dario perpetrated against N.D.M.H.:

> Q. So where were you th[e] day [Dario sexually abused N.D.M.H.]?
>
> A. I was in [Petitioner's] mother's business.
>
> Q. And who was taking care of [N.D.M.H.] that day?

---

[17] According to Respondent, "[she] was always afraid of what [Petitioner] told [her]" (Docket Entry 47 at 23), and thus she "didn't go [report Dario] because of what [Petitioner] said" (<u>id.</u>). In contrast to the above-quoted allegation that Respondent made when applying for asylum (charging both Petitioner <u>and his mother</u> with threatening to kill Respondent if she reported Dario to authorities), Respondent's trial testimony did not accuse Petitioner's mother of conveying any (even veiled) threat of that sort. (<u>Compare</u> Docket Entry 9 at 65, <u>with</u> Docket Entry 47 at 23; <u>see also</u> Docket Entry 48 at 26 ("Q. . . . [Respondent previously] state[d] that you and your mother did not want [Respondent] to go to the police [about Dario], and that you threatened to kill her. Did you do that? A. At no point in time, never.").)

-54-

A.  [Petitioner] because he was taking care of her and the grandfather.

Q.  And to your knowledge, where did they go?

A.  The river [that] was close to the house where I was living.

Q.  And how do you know they went down to the river?

A.  Because that's the version that I was told when they came back to the business.

Q.  And who told you that?

A.  [Petitioner].

. . . .

Q.  What happened to [N.D.M.H.] that day?

A.  When [Petitioner] arrived with [N.D.M.H.] and her grandfather, the grandfather had a very angry face. [N.D.M.H.] came in frightened and crying. . . .

. . . .

Q.  And then what happened?

A.  I asked [Petitioner] what was going on with [N.D.M.H.].  Then he told me that he had left [her] alone in the car for a moment.  Then he told me they -- they have a friend that I only know as Dario.  Then [Petitioner] told me that [Dario] had come to the car where [N.D.M.H.] was and he [sexually abused her]. After that I went to [N.D.M.H.] and she started to cry and I checked her over and I bathed her and she told me what [Dario] had done.

Q.  What was [Petitioner's] reaction and demeanor when he was telling you what happened to [N.D.M.H.]?

A.  He, along with his family, not leaving out his dad, took it as if it were normal.

Q.  When you say "not leaving out his dad," what do you mean by that?

-55-

A. Because the grandpa went and looked for [Dario], and
he told me that he wanted to kill [Dario] for what
[Dario] had done to [N.D.M.H.], and he also became
enemies with [Dario], but only the grandfather.

(Docket Entry 47 at 20-22.)

Nor did N.D.M.H.'s description to Ms. Bingham of the events of

that day (as quoted below) suggest that Petitioner "facilitated and

condoned" (Docket Entry 9 at 10), or "knowingly permitted . . .

said sexual abuse" (id. at 11-12):

Q. What instructions [were] given [to N.D.M.H.] before
administering this [trauma-assessment] test?

A. We talked about the reasons that she was there . . .
and one of the reasons that she had identified was that
she came to talk about  . . . what happened with the bad
man.  And so . . . [I] sa[id], "Sometimes people have
scary or bad things happen to them where someone could
have been or was badly hurt or killed.  Has anything like
that ever happened to you?"

Q. And then you ask[ed] her to please describe what
happened?

A. Yes.

Q. Okay.  And what was her response to that first
question?

A. Her response was:  "I was with my dad and my grandpa,
[and] a friend of theirs.  When we went to the river, my
daddy told me to wait with the friend, and grandpa said,
'No, she shouldn't – she should not stay with the man.'"
And that's all she said at that time.

(Docket Entry 51 at 29-30; see also id. at 33-34 (relating that

N.D.M.H. chronicled assault by Dario "that meets the definition of

a sexual trauma," without any indication Petitioner authorized such

abuse), 47 (explaining that "[N.D.M.H.] told [Ms. Bingham] that

-56-

when [Petitioner] and [N.D.M.H.'s] grandfather came back from the river and [N.D.M.H.] was crying . . . 'Dad got very, very angry,' and that [Petitioner] and [Dario] almost got into a fight. . . . [I]t sounded like that [Petitioner] responded in a manner . . . as a father would have responded had . . . he come upon his child having allegedly just experienced a sexual trauma."), 70 ("Q. In fact, [N.D.M.H.] reported that after the incident [at the river] occurred, [Petitioner] actually beat [Dario] up . . . or got angry? A. He got angry.").)

In the same vein, the Response's assertions about how, "[a]fter the death of Petitioner's father" (Docket Entry 9 at 6), "Dario began to visit the [family] residence more frequently" (id. at 7 (internal quotation marks omitted); accord id. at 65), with Petitioner's mother "continu[ing] to interfere with [Respondent's] ability to protect [N.D.M.H.], by sending [Respondent] out of the home" (id. at 7), culminating in an incident where, "while [Petitioner]'s mother sent [Respondent] to work selling food, . . . Dario showed [N.D.M.H.] pornographic videos and [Petitioner] allowed it" (id. at 65), find no support in Respondent's testimony at trial, which described only one visit by Dario (during which he never interacted with N.D.M.H., much less showed her pornography):

> Q. Did you ever personally observe Dario back in the store when you were working after [Petitioner's father] died?

-57-

A. . . . Aside from that, shortly after [Petitioner's father] died [Dario] came not to the business but to the house.

. . . .

Q. And who was home when that occurred?

A. Almost everyone was there because what I remember is that [N.D.M.H.] was outside playing and when . . . [she] saw that [Dario] came in, she came running to the room where I was. And [she] said to me, "Mom, that man has come." "I'm afraid of him," she said.

Q. What did you observe about her demeanor or appearance when she ran into the room that you were in?

A. [She] was showing a lot of fear and I told her not to worry, . . . [and] we locked ourselves in a room and then [Dario] came inside as if nothing had ever happened and her grandmother offered him a coffee, which I have never forgotten. That was when I turned to [Petitioner] and I told him to stop letting [Dario] in because of everything that had happened.

Q. And what was [Petitioner]'s reaction when you said that?

A. He just told me that it was his mom's house and that he could not limit the people who could come.

Q. Were there any other instances that you recall Dario coming around after that?

A. Since I saw that [Petitioner] wasn't doing anything, it was at that point that I said, "No, I'm leaving. Because I'm not going to let [Dario] do something to [N.D.M.H.]."

Q. And when you say you're leaving, did you mean for the day or that you were going to actually leave the residence?

A. Well, I didn't say it like that because I knew that -- with the threat that [Petitioner] was going to take [N.D.M.H.] away from me, I knew that he wasn't going to allow me to leave.

-58-

. . . .

Q. After Dario continued coming to the residence, how long did you remain living there?

A. Very little time.

(Docket Entry 47 at 28-30; see also id. at 28 (granting motion to strike Respondent's hearsay non-response about Dario "showing pornographic videos to [N.D.M.H.]" when asked "how often would Dario come back to the residence or the store"); Docket Entry 51 at 78-79 (documenting Ms. Bingham's testimony that "[Respondent] had stated that [N.D.M.H.] had been forced to watch pornography with [Dario]," but that, despite "[N.D.M.H.] report[ing a second encounter with Dario when] . . . he came to the restaurant" (at which point she "ran and hid underneath a table"), "[N.D.M.H.] never mentioned an incident of watching pornography," which, "in [Ms. Bingham's] professional opinion, [] would have come up when [N.D.M.H.] mentioned to [Ms. Bingham] the second . . . event").)[18]

Conversely, when Petitioner took the stand, he unequivocally (and, in the Court's view, credibly) denied that he "helped Dario to sexually abuse [N.D.M.H.]." (Docket Entry 48 at 27.) In connection with that denial, Petitioner gave a fairly detailed account of the events leading up to and following Dario's sexual abuse of N.D.M.H. (see id. at 20-28) and then underwent lengthy and pointed cross-examination about those matters (see Docket Entry 49

---

[18] In providing background information to Ms. Bingham, Respondent evidently only recounted one post-assault visit by Dario. (See Docket Entry 51 at 78.)

Case 1:18-cv-00449-LPA   Document 53   Filed 03/31/21   Page 59 of 79

at 41-64). That testimony (taken as a whole) raises legitimate questions about the judgment Petitioner exhibited in (A) leaving (then-preschool-aged) N.D.M.H. at the riverside with Dario (whom Petitioner identified as "an alcoholic" (Docket Entry 48 at 20)), while Petitioner, his father, and others waded out into the river to fish (see id. at 21-23; Docket Entry 49 at 43-47), as well as (B) (upon learning from N.D.M.H. what Dario had done (see Docket Entry 48 at 23; Docket Entry 49 at 47-51)) choosing neither to report him to proper authorities nor to seek professional care for N.D.M.H. (see Docket Entry 48 at 23-26; Docket Entry 49 at 56-62).[19] However, after hearing (and observing) Petitioner testify (as well as having considered all the evidence at trial), the Court finds no basis to conclude that he "facilitated and condoned" (Docket Entry 9 at 10), or "knowingly permitted [Dario's] . . . sexual abuse [of N.D.M.H.]" (id. at 11-12). The Court similarly credits Petitioner's testimony that he "did [not] provide Dario access to [N.D.M.H.] after this incident" (Docket Entry 48 at 27).[20]

Nonetheless, the Court still must consider whether the record establishes by clear and convincing evidence "a grave risk that [N.D.M.H.'s] return [to Honduras] would expose [her] to physical or

---

[19] Indeed, Petitioner himself acknowledged that, "perhaps looking back, it was wrong . . . not to have done something." (Docket Entry 49 at 58.)

[20] In doing so, the Court notes that, despite stating to asylum officials that "the man who tried to rape [N.D.M.H.] is always hanging out with [Petitioner]" (Docket Entry 9 at 43), Respondent offered no testimony at trial supporting that statement (see Docket Entry 47 at 3-104).

-60-

psychological harm," Hague Convention, art. 13(b), 1988 WL 411501, at *5, in light of (as Respondent's counsel put it) "the one thing [Petitioner] and [Respondent] agree on, which is that [N.D.M.H.] was sexually molested [by Dario] while she was in [Petitioner's] care [in Honduras]" (Docket Entry 49 at 41). In that regard, Ms. Bingham, a professionally trained and accredited mental health expert (see Docket Entry 51 at 3-7), who assessed N.D.M.H. over five sessions (see id. at 15), testified to these salient points:

1) "[N.D.M.H.] clearly had some symptoms of . . . PTSD [post-traumatic stress disorder]" (id. at 33);

2) "[N.D.M.H.] met the initial [PTSD] criteria of . . . expos[ure] to a sexual trauma" (id.; see also id. at 33-34 ("[N.D.M.H.'s abuse by Dario] meets the definition of a sexual trauma."), 37 ("Category A is: Were you exposed to a traumatic event?"), 91 (affirming that "[N.D.M.H.'s] demeanor seem[ed] consistent with children who had suffered sexual abuse"));[21]

3) N.D.M.H. also presented with an "elevated score" for "Criterion B1 [of PTSD symptom Category B], which is recurrent involuntary and intrusive distressing memories" (id. at 34-35; see also id. at 34 (explaining that N.D.M.H. "responded 'almost every

_____

[21] While speaking with Ms. Bingham, both Respondent and N.D.M.H. apparently used the nickname "Queso" to refer to the man who molested N.D.M.H., elsewhere identified in the record (including in Ms. Bingham's examination) as "Dario." (See, e.g., Docket Entry 51 at 22, 57; see also id. at 78 ("Q. Okay. In your report, you had stated that . . . [Respondent] had reported [N.D.M.H.] was exposed to Queso or Dario a second time. A. Yes.").) To avoid confusion, quotations that follow above replace references to "Queso" with "Dario."

-61-

day' . . . to the question of '[w]hen something reminds me of what happened , I get very upset, afraid or sad'"), 37 (testifying that, at points in the assessment, N.D.M.H. "stopped and put her hands in her face and busted out crying"));

4) "[N.D.M.H.] did not meet symptom[s in] . . . Category C" (id. at 35; see also id. ("Symptom Category C is 'persistent avoidance of stimuli associated with the traumatic event, beginning after the traumatic event occurred . . . .'"));

5) "[f]or [N.D.M.H.], there were four responses that met the criteria . . . [of C]ategory [D] that were elevated" (id.; see also id. (defining "Category D[ as]: '[n]egative alterations in cognitions and mood associated with the traumatic event, beginning or worsening after the traumatic event or events occurred, as evidenced by two (or more) of the [specified criteria]'"));

6) "[i]n symptom Category E, which involves 'marked alterations in arousal and reactivity associated with the traumatic event, beginning or worsening after the traumatic event'" (id. at 36), N.D.M.H. demonstrated qualifying conditions of "exaggerated startle response" (id.) and "[p]roblems with concentration in school as well" (id.);

7) "so out of essentially five [PTSD symptom] categories, [N.D.M.H.] met four of the five" (id. at 37);

8) although (during the assessment) N.D.M.H. mentioned events beyond her sexual abuse by Dario (such as corporal punishment),

-62-

which Ms. Bingham also considered traumatic, N.D.M.H.'s "response [as] to [Dario's sexual abuse] was much, much more elaborate" (id. at 41), and "the focus of [Ms. Bingham's] analysis continued to be on the original response [N.D.M.H.] gave about the incident [with Dario] at the river" (id.; see also id. at 57 (confirming that "[N.D.M.H.] is experiencing an ongoing psychological stressor as it relates to being the victim of sexual assault and held against her will by a man reportedly assaulting her"));

9) ultimately, "[Ms. Bingham] diagnosed [N.D.M.H.] with what's titled 'Other Specified Trauma and Stress-Related Disorder'" (id. at 43; see also id. ("It's an adjustment-like disorder with prolonged duration of more than six months without prolonged duration of the stressor."));

10) "the diagnosis was specifically related to [N.D.M.H.] being the victim of an alleged sexual assault and then being held against her will by the man reportedly assaulting her" (id. at 89);

11) "[N.D.M.H.] sa[id that] she was afraid to go back to Honduras" (id. at 56; see also id. at 57 ("[N.D.M.H.] presented with clinical symptoms . . . . And they are consistent with her . . . allegations of what happened with [Dario], and she . . . did express concern about what would happen to her if she went back to Honduras and [Dario] was there."), 70 ("[N.D.M.H.] said she was afraid of returning to Honduras, she was afraid of [Dario]."), 94

-63-

("[N.D.M.H.] did say to [Ms. Bingham] that [N.D.M.H.] was afraid to go back to Honduras because she was afraid of [Dario].""));

12) "there [was not] anything in [N.D.M.H.'s] assessment that indicated that she wasn't telling the truth" (id. at 91); and

13) "it would further traumatize [N.D.M.H.] to send her back [to Honduras]" (id. at 93).

In regard to that last point, the Court asked Ms. Bingham to explain "[w]hy" (id.), whereupon she stated:

> [N.D.M.H.] came to my office with a presentation of a child who was one diagnostic criteria shy of full-blown posttraumatic stress disorder. In the context of my office when she spoke about these traumas and she spoke about what happened, she cried, she became dysregulated in that office setting. She expressed fear of the man who allegedly sexually perpetrated her, and I think that that fear would certainly be exacerbated if she were to return to Honduras. I believe that it's predictable, from a clinical perspective, that she would soon meet the criteria of posttraumatic stress disorder.

(Id. (emphasis added).)

After observing Ms. Bingham testify and thoroughly reviewing the entire record,[22] the Court discerns no reason to question her

---

[22] Petitioner chose not to present any expert evidence to counter Ms. Bingham's testimony. (See Docket Entry 52 at 32 ("THE COURT: All right. Then what about your mental health witness? Have you made a decision about whether you want to continue this [trial] to allow an opportunity for that witness to appear? [Counsel for Petitioner]: Nope, we do not want to continue it.").) In requesting denial of Respondent's Grave Risk Exception defense under Federal Rule of Civil Procedure 52(c), Petitioner's counsel argued that "[Ms.] Bingham didn't conduct a forensics exam" (Docket Entry 51 at 110); however, that argument lacks significance for at least two reasons. First, although "[Ms. Bingham is] not a certified forensic interviewer, [she] ha[d] been trained in forensic interviewing, and [she] utilized that protocol." (Id. at 63; see also id. ("[A] forensic interview is essentially a legally sound method of interviewing, in this case children, that doesn't utilize leading questions. It utilizes open-ended questions, establishes ground rules, [and] establishes [that the child understands the difference between] truth or [falsity] . . . .").) Second, Ms.
(continued...)

-64-

above-quoted testimony and therefore adopts each of the 13 points noted (as well as her elaboration on the last point) as the Court's own (clearly and convincingly established) findings of fact. Based on those findings, along with the undisputed, clear and convincing evidence that N.D.M.H. suffered sexual abuse by Dario in Honduras, the Court concludes, by clear and convincing evidence, that "a grave risk [exists] that [N.D.M.H.'s] return [to Honduras] would expose [her] to . . . psychological harm," Hague Convention, art. 13(b), 1988 WL 411501, at *5, because she "faces a real risk of being hurt . . . psychologically, as a result of repatriation," Blondin v. Dubois, 238 F.3d 153, 162 (2d Cir. 2001).

Petitioner contended that, because Ms. Bingham acknowledged that her testimony about the likelihood of N.D.M.H. experiencing further traumatization and progression to satisfaction of the fifth (and final) symptom category for PTSD constituted a "clinical prediction" (Docket Entry 51 at 96), involving some "speculat[ion] . . . of what might happen" (id.), not an expression of certain "know[ledge] that that is what would happen" (id.), the Court should conclude that this case "more [closely follows] along the

---

[22](...continued)
Bingham gave cogent reasons (based on her experience) to reject the premise that "a forensic evaluation would have been a far more comprehensive assessment of [N.D.M.H.]" (id. at 64). (See id. at 64-65; see also id. at 66 ("THE COURT: If you had . . . a certification in forensic interviewing, would that have changed your ability to make an assessment about the credibility of what [Respondent] or [N.D.M.H.] was telling you? A. I don't believe so . . . .").)

lines of *McManus[ v. McManus*, 354 F. Supp. 2d 62 (D. Mass. 2005)]
than . . . *Blondin*" (Docket Entry 51 at 111).  The Court disagrees.

First, unlike this case, where (as documented above) Ms.
Bingham (A) diagnosed N.D.M.H. with a trauma-related disorder,
(B) definitively concluded that she meets four of the five symptom
categories for PTSD, and (C) forecast exacerbation of her symptoms
upon return to Honduras due to her clearly expressed association of
such return with an increased risk of contact with Dario (and
further sexual violence), the evidence in <u>McManus</u> reflected a much
less specific possibility of a much more generalized form of
psychological "distress," <u>McManus</u>, 354 F. Supp. 2d at 70, which (in
any event) that court deemed likely to occur "regardless of whether
[the subject children] stay in Massachusetts or return to Northern
Ireland, . . . as a result of their parents' marital and parenting
problems," <u>id.</u>  Further, the fact that the Grave Risk Exception
"undoubtedly encompasses an 'almost certain' recurrence of
traumatic stress disorder," <u>Blondin</u>, 238 F.3d at 163 (internal
brackets omitted), does not mean that <u>only</u> "an 'almost certain'
recurrence of traumatic stress disorder," <u>id.</u>, falls within the
(admittedly "narrow," <u>Miller</u>, 240 F.3d at 402) bounds of the Grave
Risk Exception.  <u>See generally</u> <u>New England Power Generators Ass'n,</u>
<u>Inc. v. Federal Energy Regul. Comm'n</u>, 707 F.3d 364, 370 (D.C. Cir.
2013) ("Their argument boils down to a single misconception:
because the existence of a contract rate mandates application of

-66-

the *Mobile–Sierra* presumption, the absence of a contract rate precludes it. An example of the logical fallacy 'denying the antecedent,' th[eir] reasoning is invalid." (internal footnote omitted)). Finally, other courts have found "[a] grave risk of psychological harm," Acosta v. Acosta, Civ. No. 12-342, 2012 WL 2178982, at *9 (D. Minn. June 14, 2012) (unpublished), aff'd, 725 F.3d 868 (8th Cir. 2013), based on evidence of "behavior indicative of psychological harm," id., despite the fact that "no clinical diagnosis exists," id.; see also id. ("[T]here is no requirement that psychological harm have actually occurred. It is sufficient that a grave risk exists." (internal citation omitted)); Ostevoll v. Ostevoll, No. C-1-99-961, 2000 WL 1611123, at *15-17 (S.D. Ohio Aug. 16, 2000) (unpublished) (finding grave risk of psychological harm despite fact that expert had not rendered PTSD diagnosis for subject children, but instead offered "his own 'diagnostic impression . . . [of] at the very least severe stress disorder'").

As a final matter, the Court must "return to the place where we started," Oregon Short Line R.R. Co. v. Department of Revenue, 139 F.3d 1259, 1265 (9th Cir. 1998), i.e., Petitioner's (admittedly unlawful) decision, as a 20-year-old man, to impregnate a 13-year-old girl, and (even more significantly) his "[f]ail[ure] to learn from [that] mistake," United States v. Hamilton, 19 F.3d 350, 352 (7th Cir. 1994). Specifically, in addition to the risk of psychological harm to N.D.M.H. that the Court has found (based on

-67-

Ms. Bingham's testimony), the Court concludes that Petitioner's testimony embracing the prospect of N.D.M.H. entering into the same type of statutory-rape relationship which he induced Respondent to enter with him establishes "a grave risk that [N.D.M.H.'s] return [to Honduras] would expose [her] to . . . physical or psychological harm," Hague Convention, art. 13(b), 1988 WL 411501, at *5.

In that regard, despite acknowledging that his commencement (at age 19 or 20) of a sexual relationship with (a then-13-year-old) Respondent was "not legal" (Docket Entry 49 at 12) and "could [be] consider[ed] . . . rape" (id. at 14), as she was but a "child" (id. at 15), Petitioner repeatedly defended such illicit arrangements as the norm in Honduras, including testifying:

1) when asked "is it appropriate for a 19-year-old man to be flirting with a girl who . . . had just turned 13, a few weeks [earlier]" (id. at 10), "we in my country see that at an early age young people, whether they're older or a little younger, . . . they do fall in love" (id.);

2) in response to a request for clarification if Petitioner "say[s] that in [Honduras] it's appropriate or okay for a 19-year-old to fall in love with a 13-year-old" (id.), that "[i]t's not right, and it's not wrong either" (id. at 10-11; see also id. at 11 ("We feel that people are young, right, and if we start to like each other and we run into each other, . . . we can be with one another. And it's not by force or anything, right."));

-68-

3) that, although "it is illegal" (id. at 11), "for a 19-year-old man to date a 13-year-old girl in Honduras" (id.), "if both families are in agreement, there's not any problem with it" (id.; see also id. at 12 ("[H]ere if the couple seems to be okay and stable, then they can keep on going and being together. That's how it is in my country. There's not a problem with it.")); and

4) as to whether "a 19-year-old man [legally may] have sex with a 13-year-old girl in Honduras" (id. at 12): "it depends on how the family takes it" (id.; see also id. at 14 ("[W]e could consider it to be rape, but allow me to explain. In my country, young people, even as young as 10 years old, may start to have sex with people of their own age, right.")).

Petitioner then gave this testimony about N.D.M.H. following that same path down which he previously led Respondent:

> Q. If [N.D.M.H.] were returned to you, okay, and let's say at 13 years old she meets a guy that she likes and he's 19 or 20, would you let [her] date that man?
>
> A. Okay. Stop. We're going to explain.
>
> . . . .
>
> Q. Would you let [N.D.M.H.] date a 19-year-old or 20-year-old[?]
>
> . . . .
>
> [A.]: . . . [L]ike any other human being, she has feelings; and if she tells me, "Daddy, I love such and such person," I will talk to her, tell her the good things, the bad things, what we can do . . . .
>
> . . . .

-69-

Q.  So you would let her date that man if she said she loved him?

A.  Like I was telling you, I would talk to her first, you know, because the youth nowadays, if . . . you don't let them, then they're going to start coming up with ideas like maybe take their own lives and things.

Q.  So the answer is yes?

A.  As I say, we need -- we need to make decisions for their welfare.

Q.  So you would let her date this man because it's good for her health?

A.  Well, if she's -- if she's in love, I would need to be checking on that.

Q.  Okay.  Would you let a 13-year-old [N.D.M.H.] leave your house and live with that man?

A.  As I say, I would need -- I would need to talk to her, sit with her and talk about it.

Q.  But it's your testimony that if she said, "Papi, I'm in love," you would let her go live with her 19- or 20-year-old boyfriend?

A.  Well, that's when decisions are made.  If she says that she's in love, we'll then bring that young man here and let's see his qualities, but not exactly about money. But I would try to get him to come to the house to see my daughter.

Q.  If you found out that a 20-year-old man was having sex with 13-year-old [N.D.M.H.], would you call the police?

A.  First of all, we need to call the daughter's attention.

Q.  So you would not call the police?

A.  Well, . . . as I repeat myself, I would talk to her and have her explain to me . . . .

(Id. at 16-18 (emphasis added).)

-70-

After that exchange – troubling in many ways, but most particularly because (in the segment emphasized) Petitioner appeared to (cryptically) admit that the more money a man possessed the more inclined Petitioner would become to the prospect of 13-year-old N.D.M.H. moving in with the man – Petitioner closed with this summary of his (misogynistic) views on young teen girls:

> [W]e send them to school and then they become, like, young women and they feel like they're older because they have a nice body because -- well, they're in the developing stage. They're growing up.
>
> . . . .
>
> Because at that -- at that puberty stage, the girls, they -- they flirt a lot, as we say, because we might think they're doing their homework and they're not.
>
> . . . .
>
> Because we -- we send them to do their homework, and then it's in school when they fall in love and they say -- and when they say, "I'm going to do homework," they go and they see each other with -- her and the boy.

(Id. at 18-19 (emphasis added).)

With his testimony on this subject, Petitioner has clearly and convincingly established that he will not protect N.D.M.H. from predatory older males who (following what he described as routine custom in Honduras) may seek to involve her (at ages as young as 10) in exploitative, sexual relationships of the sort that resulted in Respondent giving birth at 14 to N.D.M.H. That circumstance poses for N.D.M.H. "a grave risk . . . [of] physical or psychological harm," Hague Convention, art. 13(b), 1988 WL 411501,

-71-

at *5.  See Burns, 2009 WL 3617448, at *12 (observing that "statutory rape" involves "large potential for harm to the young woman involved," even "where the guilty party was not abusive"); see also Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 378 (8th Cir. 1995) ("To ensure that the child is adequately protected, the Article 13b inquiry must encompass some evaluation of the people and circumstances awaiting that child in the country of his habitual residence.").[23]  Accordingly, the Court rules the Grave Risk Exception satisfied on that ground as well.[24]

_____

[23] Given Petitioner's admission that Honduras law criminalizes sex between adults and children (see Docket Entry 49 at 14 ("Q. . . . Is it illegal for a 20-year-old-man to have sex with a 13-year-old girl?  A.  Yes, it's illegal."), 15 ("Q. . . . Can a 20-year-old man go to jail for having sex with a 13-year-old in Honduras?  A.  As long as the mother takes action, it's likely.")), protecting N.D.M.H. from this risk does not represent the type of cultural chauvinism against which the Supreme Court has cautioned, see Abbott, 560 U.S. at 20 (directing courts to "strive always to avoid a common tendency to prefer their own society and culture" in resolving Hague Convention cases).

[24] "[C]ourts retain the discretion to order return even if . . . the [Grave Risk E]xception[] is proven."  Miller, 240 F.3d at 402 (internal quotation marks omitted).  The decision to exercise that discretion generally involves reliance on the premise "that courts in the abducted-from country are as ready and able as we are to protect children."  Id. (internal quotation marks omitted).  In this instance, even if Honduran courts adequately could address the second grave risk found above (i.e., of physical or psychological harm to N.D.M.H. arising from Petitioner's lack of concern about statutory rape), the nature of the first grave risk found above (i.e., of psychological harm to N.D.M.H. arising from aggravation of her trauma-related mental health condition by return to Honduras) does not lend itself to amelioration by Honduran courts.  As a result, the Court declines to exercise its discretion to order return.  Lastly, the Response requests "[t]hat an award of legal costs, fees and expenses incurred to date by Respondent be [o]rdered pursuant to 42 U.S.C. § 11607 (2000)."  (Docket Entry 9 at 15 (missing space added).)  That provision from ICARA, now codified at 22 U.S.C. § 9007, provides for an order to "the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs[ and] legal fees," 22 U.S.C. § 9007(b)(3), when a "court order[s] the return of a child," id.  In other words, "the shifting of fees and costs authorized by § 9007(b)(3) only benefits prevailing petitioners . . . ."  Carvajal Vasquez v. Gamba Acevedo, No. 3:18CV137, 2018 WL 10374690, at *2 (M.D. Tenn. July 5, 2018) (unpublished); accord White v. White, 893 F. Supp. 2d 755, 758-59 (E.D. Va. 2012).

-72-

<u>CONCLUSION</u>

Respondent has established by clear and convincing evidence that the Grave Risk Exception in Article 13(b) of the Hague Convention applies. In connection with that ultimate determination, the Court highlights these Findings of Fact and Conclusions of Law (from the larger pool thereof appearing throughout the Discussion section):

<u>Findings of Fact</u>

1) N.D.M.H. was habitually resident in Honduras at the time Respondent removed N.D.M.H. to the United States;

2) Respondent's removal of N.D.M.H. to the United States breached Petitioner's custody rights under Honduran law;

3) Petitioner had been exercising his custody rights under Honduran law at the time Respondent removed N.D.M.H. to the United States;

4) Respondent submitted false sworn statements to the Court regarding alleged domestic violence perpetrated against her by Petitioner;

5) Respondent's trial testimony did not support and, in fact, contradicted many (including the most serious) of her original allegations of domestic violence;

6) Respondent's fabrications and failure to offer any plausible explanation for her prior false and inconsistent

-73-

statements rendered unreliable most of her testimony before this Court;

7) even if believed, Respondent's trial testimony about acts of domestic violence by Petitioner against her did not show any targeting or traumatizing of N.D.M.H.;

8) as to any physical or emotional abuse of N.D.M.H. by Petitioner, the evidence at trial showed (at most) that Petitioner used a cord or cable to administer corporal punishment to N.D.M.H. on "several occasions," when she ran across a street without permission or failing to listen, leaving marks on her legs or feet that lasted two or three days;

9) N.D.M.H. does not fear Petitioner;

10) Respondent administered equally harsh corporal punishment with less justification, by striking N.D.M.H. with a stick when she struggled in school;

11) N.D.M.H. suffered a sexual assault by a friend of Petitioner's family, while in Petitioner's care;

12) neither Petitioner nor his mother knowingly facilitated, condoned, or permitted that sexual assault on N.D.M.H.;

13) Petitioner did not allow the perpetrator access to N.D.M.H. after that sexual assault;

14) Petitioner did not report the sexual assault to proper authorities and did not obtain professional care for N.D.M.H.;

-74-

15) as a result of that sexual assault, N.D.M.H. clearly displayed symptoms of PTSD;

16) N.D.M.H. met the initial PTSD criterion of exposure to a sexual trauma;

17) N.D.M.H. also presented with an elevated score for Criterion B1 of PTSD symptom Category B, which concerns "recurrent involuntary and intrusive distressing memories";

18) N.D.M.H. did not meet symptoms in Category C;

19) N.D.M.H. gave four elevated responses that met the criteria of Category D, which concerns "negative alterations in cognitions and mood associated with the traumatic event";

20) in symptom Category E, which concerns "marked alterations in arousal and reactivity associated with the traumatic event," N.D.M.H. demonstrated qualifying conditions of "exaggerated startle response" and "problems with concentration in school";

21) out of five PTSD symptom categories, N.D.M.H. met four;

22) although (during the assessment) N.D.M.H. mentioned potentially traumatic events beyond her sexual abuse by Dario, she gave a "much, much, more elaborate response" about that sexual abuse and N.D.M.H.'s assessment continued to focus on the original response she gave about the incident with Dario at the river;

23) N.D.M.H. received a diagnosis of "Other Specified Trauma and Stress-Related Disorder";

-75-

24) that diagnosis was specifically related to N.D.M.H.'s prior sexual abuse;

25) N.D.M.H. expressed fear of going back to Honduras, particularly because of her fear of the man who sexually assaulted her;

26) nothing in N.D.M.H.'s assessment indicated that she failed to tell the truth;

27) it would further traumatize N.D.M.H. to send her back to Honduras;

28) N.D.M.H. presented as a child one diagnostic criterion shy of full-blown PTSD;

29) when N.D.M.H. spoke about what happened, she cried and became dysregulated in an office setting;

30) N.D.M.H.'s fear of the man who sexually abused her would certainly be exacerbated if she were returned to Honduras and "it is predictable, from a clinical perspective," that she would soon meet the criteria of PTSD if returned to Honduras;

31) Petitioner, as a 19- or 20-year-old man, commenced a sexual relationship with then-13-year-old Respondent, who thereafter moved in with Petitioner;

32) Respondent was 14 years old when she gave birth to N.D.M.H.;

-76-

33) Petitioner acknowledged that such relationship constitutes rape under Honduran law and that such conduct could result in imprisonment;

34) Despite that acknowledgment, Petitioner refused to characterize such relationship as "wrong";

35) Petitioner indicated that he would not prohibit N.D.M.H., during her future adolescence, from entering into a sexual relationship with an adult;

36) Petitioner further declined to foreclose the possibility that he would permit a 13-year-old N.D.M.H. to live with an adult with whom she maintained a sexual relationship; and

37) Petitioner testified that, upon discovery of such relationship, rather than call the police to report the rape of his daughter, he would ask her for an explanation and would investigate the man's "qualities."

## Conclusions of Law

1) Petitioner proved by a preponderance of the evidence that N.D.M.H. was wrongfully removed from Honduras to the United States within the meaning of the Hague Convention;

2) Respondent failed to prove by clear and convincing evidence a grave risk that N.D.M.H.'s return to Honduras would expose her to physical or psychological harm within the meaning of the Hague Convention, based on domestic violence committed by Petitioner against Respondent;

-77-

3) Respondent failed to prove by clear and convincing evidence a grave risk that N.D.M.H.'s return to Honduras would expose her to physical or psychological harm within the meaning of the Hague Convention, based on Petitioner's use of corporal punishment against N.D.M.H.;

4) Respondent proved by clear and convincing evidence a grave risk that N.D.M.H.'s return to Honduras would expose her to physical or psychological harm within the meaning of the Hague Convention, based on both (A) the sexual abuse she suffered at the hands of a third-party while in Petitioner's care in Honduras, which has caused her to develop a trauma-related mental health condition, which a return to Honduras likely would exacerbate, and (B) Petitioner's willingness to allow N.D.M.H. to fall victim to statutory rape, in the same manner that he victimized Respondent;

5) the nature of the grave risk to which N.D.M.H.'s return to Honduras would expose her in regards to her trauma-related mental health condition does not fall into the category of risks that Honduran courts effectively could mitigate and thus an inadequate basis exists for a discretionary order of return notwithstanding the grave risk determination in Respondent's favor under the Hauge Convention; and

6) ICARA does not permit expense-, fee-, and/or cost-shifting for the benefit of prevailing respondents.

**IT IS THEREFORE ORDERED** that the Petition (Docket Entry 2) is

**DENIED.** A Judgment will be entered accordingly.

                              /s/ L. Patrick Auld
                            **L. Patrick Auld**
                      **United States Magistrate Judge**
March 31, 2021